**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**FREEDOM WATCH, INC.**

                   Plaintiff,

     v.

**ORGANIZATION OF PETROLEUM
EXPORTING COUNTRIES,**

            Defendant.

Civil Action No.  1:12-cv-00731 (RBW)

---

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF SERVICE OF PROCESS

Plaintiff Freedom Watch hereby files its Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss.

## INTRODUCTION

Defendant, Organization of Petroleum Exporting Countries ("OPEC"), having colluded and conspired to fix the price of oil and gasoline to divide markets in order to artificially raise the price of oil for over thirty years, now must account legally during these hard economic times, where the price of oil and gasoline is at record highs as a result of Defendant's conduct.  This restraint of trade, which directly extends to American soil and has been perpetrated in a blatant violation of U.S. antitrust laws, must finally be ordered to cease and desist.  Defendant now claims that service of process was not proper in an effort to escape liability.  Yet Defendants cannot be allowed to immunize themselves from U.S. antitrust law.  If Defendant chooses to play ball in our court, it must play by our rules.  Foreign law cannot-- and does not-- trump U.S. law. Defendant's actions are blatant, intentional, and per se violations of U.S. antitrust laws, plain and

simple!  Defendant's actions have never been adjudicated in an American court of law and this an important case as a result.  OPEC cannot and should not escape liability for its anti-competitive practices during these hard economic times for Americans, where the price of gasoline has risen to over $5.00 a gallon in some states.  This is crippling American consumers.[1]

## STATEMENT OF FACTS

On May 7, 2012 Plaintiff Freedom Watch ("FW") filed suit against Defendant OPEC alleging violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 15, 26.  On May 14, 2012 Defendant was personally served at their headquarters in Vienna Austria.  OPEC was personally served by hand when a copy of the summons and complaint were delivered to Frederick Luger, Intake Officer for OPEC, and he accepted service on behalf of OPEC's Secretary General.  Exhibit 1.  Defendants concede that a summons and complaint were received by hand at OPEC's headquarters, but mistakenly believe it was by Larry Klayman, counsel for Plaintiff.  Def's Mot. to Dismiss at 5.  Defendants were served by someone who is not a party to this action.  Exhibit 1.  Mr. Luger, acting as an agent for OPEC's Secretary General, did not reject or refuse service of process.  A copy of the summons and complaint was sent by Austrian mail to OPEC on or about May 14, 2012 as well.

About two weeks later, Defendant filed a Motion for Extension of Time requesting nearly two months to respond with a dispositive motion.  [Docket no. 2].  Defendant then moved for a bifurcated briefing schedule in order to first address the issue of whether service of process was proper. [Docket no. 3].  Having nearly three months to file a dispositive motion, Defendant

---

[1] It is also well known that some members such as Iran, Saudi Arabia, and Venezuela use oil revenues to finance terrorism and terrorist groups in acts against Americans and others.

served thousands of pages of pleadings and documents in an effort to dismiss this case by

claiming that Defendant was not served with the proper service of process.  Particularly given the

mountain of pleadings that OPEC has filed, the absurdity of Defendant claiming that it was not

served and had no actual notice of this suit through its attorneys is apparent on its face.


## ARGUMENT

Service of Process Was Proper

Rule 4(f)(3) of the Federal Rules of Civil Procedure ("FRCP") allows for service on

individuals outside of the United States to be accomplished by other means not prohibited by

federal law. The "Agreement Between The Republic of Austria and OPEC" ("Headquarters

Agreement") provides that "the service of legal process…shall not take place within the

headquarters seat except with the express consent of, and under the conditions approved by, the

Secretary General."


Notwithstanding this, OPEC's claim that service of process was improper is without

merit. Rather, OPEC was properly served, consistent with due process requirements, particularly

in light of the fact that OPEC cannot reasonably contend that it does not have actual notice as it

continues to extensively participate in this litigation.


*In re Ski Train Fire in Kaprun Austria on Nov. 11, 2001, 343* F.Supp.2d 208 (S.D.N.Y.

2004) is on point. In *Ski Train*, the court denied dismissal of the case even though copies of the

summons and complaint were mailed to the Austrian corporations after plaintiff's efforts to serve

them through letters rogatory unsuccessful. The court held that the case would not be dismissed,

even though service of process did not satisfy the requirements of Austrian law as the court

reasoned that the corporation had actual knowledge of the litigation and was not prejudiced by non-delivery, as it knew about and participated in the litigation.

*Prewitt Enters., Inc. v. Organization of Petroleum Exporting Countries*, 353 F.3d 916 (11th Cir. 2003), cited by Defendant, is distinguishable from this case. In *Prewitt*, the plaintiff first attempted to serve OPEC by requesting that the trial court send a copy of the complaint to OPEC by international registered mail, return receipt requested. OPEC argued that service was improper under Austrian law because the method of service-registered mail- was specifically prohibited. The U.S. Court of Appeals for the Eleventh Circuit denied the plaintiff's request to uphold service on OPEC via mail or to permit service via fax or email. The Eleventh Circuit noted that Article 5(2) of the Headquarters Agreement states that, "the service of legal process…shall not take place with the OPEC headquarters seat except with express consent of, and under conditions approved by, the Secretary General."  The court emphasized that "we do not say that a district court never has discretion to direct service of process under Fed.R.Civ.P. 4(f)(3) that is in contravention of a foreign law." *Id.* at 927.  *Prewitt* is inapplicable particularly in light of the facts and circumstances here.   And Prewitt is not a case from this circuit so it has no precedential weight vis-a-vis this court.

Specifically, Plaintiff made further efforts to ensure that OPEC was given notice of the pending litigation, including personal service on an agent on behalf of OPEC in addition to mailing the complaint. Moreover, the agent of OPEC accepted service on behalf of OPEC and its Secretary General without any objection.  Exhibit 1.  In short, OPEC accepted service, has fully participated in the litigation, and, as *In re Ski Train* waived its right to move to dismiss based on improper service. Plaintiff's method of service complied with constitutional due process

requirements, giving actual notice to the Defendant and providing ample opportunity for Defendant to respond. As the U.S. Court of Appeals for the Ninth Circuit confirmed in, *Rio Props., Inc. v. Rio Int'l Interlink,* 284 F.3d 1007, 1016, the "Constitution does not require any particular means of service of process, only that the method selected be reasonably calculated to provide notice and an opportunity to respond."

It is clear that Defendant OPEC has had actual notice of suit and has responded in this court with a mountain of pleadings filed by the mega-firm of White and Case, and its attorneys.

Dismissal Based On Improper Service Is Violative Not Only Of American Law But Also Public Policy.

In the alternative, to require Plaintiff to strictly comply with the Headquarters Agreement would contravene public policy and result in detrimental harm to the United States while OPEC continues in its price-fixing practices and market division per se antitrust violations.  Flouting U.S. antitrust law, OPEC attempts to essentially fend off all lawsuits against it by conveniently refusing to give consent to be served. As long as OPEC continues to withhold its consent to be served, it would enjoy absolute immunity while those who suffer the consequences of OPEC's illegal conduct are deprived of meaningful remedies. Essentially, the attempted impossibility of serving OPEC ultimately leaves no other viable recourse. As one judge aptly noted, "The notion of wholly insulating from service of process an entity such as OPEC- whose decisions surely affect the daily lives of most Americans- is for many, a bitter pill to swallow." See XLV Middle East Economic Survey 32 (12 August 2002).

OPEC Had Actual Notice.

"The Third Circuit has noted that "rather than making a service on foreign instrumentalities a rigid, technical, or cumbersome procedure, Congress sought to facilitate the ability of private plaintiffs to serve foreign entities. In addition, Congress wished to insure that the sovereign owner would receive actual notice." *Velidor v. L/P/G Benghazi*, 653 F.2d 812 (3rd Cir. 1981). Thus, once courts have determined that defendants received actual notice, they have allowed the case to proceed. *Montanez-Miranda V. Banco Progreso Internacional De Puerto Rico*, 973 F. Supp. 89, 91 (D.P.R. 1997) *Citing Sherer v. Construcciones Aeronauticas, S.A.*, 987 F.2d 1246 (6th Cir. 1993).

In this case, OPEC clearly has actual notice.  OPEC is not an unsophisticated entity; it has an army of attorneys at its disposal. No less than four of these attorneys have appeared in this action, and are actively involved with the litigation.  In fact, counsel for Defendant have filed a *mountain of pleadings* simply to attempt to dismiss this action before it is heard on the merits. Service of process was simply intended to ensure that parties know of any lawsuits and are given a chance to be heard in open court.  This is clearly the case here.

In sum, OPEC is actively engaged in litigation, and has even hired a mega-law firm to represent itself.  There is no risk that a judgment will be unfairly entered without Defendant having been given an opportunity to defend itself.   Thus, the fact that Defendant has actual notice of this lawsuit demonstrates that service of process was effective in notifying the Defendant and this case can now be heard on its merits.

This Court May Allow Alternative Means for Service of Process.

Alternative methods of service may be liberally approved under the discretion of the district court. Under Rule 4(f)(3), "courts have authorized a wide variety of methods of service including publication, ordinary mail, mail to the defendant's last known address, delivery to the defendant's attorney, telex, and most recently, email." *Rio Props. v. Rio Int'l Interlink,* 284 F.3d 1007 (9th Cir. Nev. 2002). Specifically, in *Rio Properties*, the U.S. Court of Appeals for the Ninth Circuit held that the district court properly found that alternative service via international courier and via email was constitutionally acceptable. *Id*. at 1016–17. The Ninth Circuit confirmed that the "Constitution does not require any particular means of service of process, only that the method selected be reasonably calculated to provide notice and an opportunity to respond." *Id*. at 1017; see also *Chanel, Inc. v. Lin*, 2009 WL 1034627, at *2 (S.D. Fla. April 16, 2009) (noting that a method of service under Rule 4(f)(3) should be calculated "to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections").

In addition, under Rule 4(f)(3) of the FRCP courts have allowed a wide variety of methods for service of process. Email and fax have frequently been approved to effectuate service pursuant to Rule 4(f)(3), particularly where the plaintiff can present evidence to the court that the email address or fax number is used by the defendant on whom service is sought. See *Liberty Media Holdings, LLC v. Vingay.com*, 2011 WL 810250 (D. Ariz. March 3, 2011) (approving email service); *Xcentric Ventures, LLC v. Karsen, Ltd.*, 2011 WL 3156966, at *2 (D. Ariz. July 26, 2011) (granting email service pursuant to Rule 4(f)(3)); *U.S. Commodity Futures Trading Com'n v. Aliaga*, 272 F.R.D. 617, 621 (S.D. Fla. 2011) (granting leave pursuant to Rule 4(f)(3) to serve the summons, complaint, and all subsequent pleadings and discovery on the

7

defendant located in Honduras); *Philip Morris USA, Inc. v. Veles*, Ltd, 2007 WL 725412, at *2–3 (S.D.N.Y. Mar. 12, 2007) (authorizing service by email and facsimile pursuant to Rule 4(f)(3)).

Another common method of service pursuant to Rule 4(f)(3) is service on a defendant's United States-based attorney, when there is evidence of an attorney-client relationship. See *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 931 (N.D. Ill. 2009) (directing substituted service on U.S. attorneys retained by Russian defendants); *Brookshire Bros., Ltd. v. Chiquita Brands*, Int'l, 2007 WL 1577771, at *2 (S.D. Fla. May 31, 2007) (authorizing service on foreign defendants through local counsel); *U.S. Commodity Futures Trading Com'n v. Aliaga*, 272 F.R.D. at 621 (S.D. Fla. 2011) (authorizing service on an attorney in the United States); RSM *Prod. Corp. v. Fridman*, 2007 WL 2295907, at *6 (S.D.N.Y. Aug. 10, 2007) (authorizing service on the defendant's U.S. counsel); *LG Elecs, Inc. v. Asko Appliances, Inc.*, 2009 WL 1811098, at *4 (D. Del. June 23, 2009) (finding that, pursuant to Rule 4(f)(3), service on an attorney was permissible in light of the regularity of contact between the defendant and his attorney). Clearly, at a minimum, OPEC has also been served through its attorneys who are located in Washington, D.C. not Vienna, Austria.

Ineffective Service Of Process Would Deem The Sherman Antitrust Act Meaningless.

15 U.S.C. § 4 states in pertinent part, "The several district courts of the United States are invested with jurisdiction to prevent and restrain violation of sections 1 to 7 of this title [anti-trust act]; and it shall be the duty of the several United States attorneys, in their respective districts…to institute proceedings in equity to prevent and restrain such violations…" U.S. antitrust laws have extraterritorial application and it is settled law of the right to exercise jurisdiction over foreign conduct which affects the United States.

Although there are numerous federal antitrust laws in the United States, the Sherman Act, 15 U.S.C. §§ 1–7, is perhaps one of the most significant. [2]"The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest qualify and the greatest material progress." *Northern Pacific Railway v. United States,* 356 U.S. 1, 4 (1958).

OPEC's position and the Headquarters Agreement are clearly in contravention of this law, particularly since OPEC's contention is essentially that the only means for proper service is to obtain its consent, which would be a daunting task when seeking to stop OPEC from antitrust violations, such as price-fixing and market division. To hold that the Headquarters Agreement supersedes U.S. antitrust law, and that OPEC is immune from suit, would render the Sherman Act and other U.S. antitrust laws meaningless, ineffective, and void. The perpetuation of this subterfuge would undoubtedly subject the United States to economic risk and harm, particularly as OPEC continues to engage in price-fixing and market division, fully aware that it simply has to refuse consent to service. As such, it is crucial that OPEC's request for dismissal based on lack of service of process be denied and OPEC be held accountable for its illegal conduct.

For the foregoing reasons it is clear that effective service of process has occurred.  If the court wishes, Plaintiff can also effectuate service of process upon Defendant in any of the other methods described above.  Plaintiff can even publish notice and the complaint on the internet, or

---

[2] Larry Klayman, counsel for Freedom Watch, in an earlier period of his legal career, was a trial attorney for the Antitrust Division of the U.S. Department of Justice.  He participated in the lawsuit that resulted in the breakup of AT&T under Section 2 of the Sherman Act, 15 U.S.C. § 2.

some other method.  Yet the bottom line is that Defendant has actual notice and is actively

participating in this lawsuit.  Service has thus occurred through OPEC itself and through its

attorneys.  Even so, service of process has been and can always be made on OPEC using one

method or another -- to avoid its using a subterfuge to avoid scrutiny under U.S. antitrust laws.

OPEC thus seeks to elevate form over substance and its attempt to avoid service of process is

futile.


Defendant's Other Claims Are Similarly Meritless.

In addition to the claim that Defendant was not properly served, Defendant also

laboriously argues various other defenses in an attempt to influence the court's decision.  Yet

Defendant's other legal defenses have been previously attempted and routinely rejected by U.S.

courts.  As summarized by legal scholars Earl W. Kinter and Katherine Drew Hallgarten:

> Even where, as a practical matter, a foreign government approves and
> lends support to private activities in its country which affect the United States
> trade, such approval cannot convert an essentially private conspiracy into a
> system of governmental regulation shielded from antitrust liability by the doctrine
> of sovereign immunity.  In *United States v. Watchmakers of Switzerland
> Information Center, Inc.*, the defense of sovereign immunity was urged
> unsuccessfully in such a situation.  In that case, the United States alleged a
> conspiracy between several Swiss and American companies and trade
> associations, some of whom were named as defendants, some as co-conspirators
> only, to impose unreasonable trade restraint on the foreign and domestic trade and
> commerce of the United States in violation of section 1 of the Sherman Act and
> section 73 of the Wilson Tariff Act.
>
> The conspirators were manufacturers and sellers of Swiss watches and
> watch parts, together with their trade associations.  The basis of the complaint was
> a private agreement called the "Collective Convention," executed in Switzerland,
> by Swiss organizations.  The Convention bound the Swiss signatories and their
> subsidiaries in the United States. It was intended to, and did, restrict unreasonably
> the manufacture of watches and watch parts in the United States, and restrain
> United States imports and exports of watches and watch parts for both
> manufacturing and repair purposes.  Various other restrictive practices were
> charged. The Swiss Government, indicating its approval of these private

arrangements, passed legislation in aid of the Convention signatories.  For example, any signatory who breached any of the Convention's provisions was, under Swiss law, subject to private sanctions provided in the Convention, and nonsignatories were subjected to certain price and other regulations.

Defendants claimed that the court should not assume jurisdiction over their activities because antitrust laws cannot be applied to acts of sovereign governments.  They apparently based this defense on the fact that the agreements were entered into and became effective in Switzerland and were sanctioned by Swiss law.  In rejecting defendants' claim of lack of jurisdiction, the court stated that the defendants' activities were not required by Swiss law.  They were agreements formulated privately without compulsion on the part of the Swiss Government.  The court reasoned that although these agreements were "recognized as facts of economic and industrial life by the nation's government." that form of governmental action did not convert them into agreements required by that foreign country's law.

If, on the other hand, a foreign government actually compels a person to act as he does, and such act might otherwise violate United States antitrust laws, such compulsion is a complete defense to an antitrust case based on the act compelled.  Furthermore, the "Act of State" doctrine prevents the court from inquiring into the validity of the law of the foreign state under which the person acted.  This defense was successfully raised by defendants in *Ineramerican Refining Corp. v. Texaco Maracaibo, Inc.* Plaintiff Interamerican charged that it was unable to obtain Venezuelan  crude oil necessary for its refinery in New Jersey because of defendants suppliers' refusal to deal with it. Summary judgment was granted to the defendant suppliers, however, because the Venezuelan government had forbidden sales of its oil which would reach Interamerican, directly or indirectly.  By its ruling the court carried the "scant authority" of the dicta in *Continental Ore* and *Swiss Watchmakers*, as to when compulsion is a defense, one step farther, referring to the antitrust exception" in the case of acts of foreign sovereign in its own jurisdiction.  The court reasoned that sovereignty includes the right to regulate commerce within the nation and stated:

> When a nation compels a trade practice, firms there have no choice but to obey.  Acts of business become effectively acts of the sovereign.  The Sherman Act does not confer jurisdiction on the Untied States courts over acts of foreign sovereigns.  By its terms, it forbids anticompetitive practices of person and corporations.

The court denied plaintiff's request to conduct an inquiry into the validity of the Venezuelan laws.  For the court to rule on the validity of the foreign laws would be interference in a matter f foreign policy, a political question, outside the province of the court.

Earl W. Kinter and Katherine Drew Hallgarten, *Application of United States Antitrust Laws to Foreign Trade and Commerce -- Variations on American Banana Since 1909*, 15 B.C.L. Rev. 343 (1973), http://lawdigitalcommons.bc.edu/bclr/vol15/iss2/4.  Exhibit 2.

Thus, as discussed above, in the landmark case of *United States v. Watchmakers of Switzerland Information Center, Inc.*, 1963 Trade Cas. (CCH) P70,600, the court concluded that the collective watchmakers, in agreeing to and engaging in a "combination and conspiracy to retrain unreasonably the foreign and interstate trade and commerce of the United States" were not only under the jurisdiction of the United States, but were also in clear violation of section 1 of the Sherman Act and section 73 of the Wilson Tariff Act.  *Id.* at 151,152.  Exhibit 3. Rejecting all other defenses, the court concluded "[t]he only question here is whether the acts of the defendants have affected United States trade and commerce, and, if so, whether they have restrained such trade and commerce.  It is obvious from the facts that they have." *Id.*at 154. *Swiss Watchmakers* is clear and on point in this case against OPEC.

This court must similarly look to nothing but the facts of the case to determine whether OPEC is in violation of U.S. antitrust laws as Plaintiff alleges.   In order to do so, this case must respectfully be heard on its merits, just as it was in *Swiss Watchmakers* and countless other antitrust lawsuits against foreign entities like OPEC seeking to escape liability under the guise of government regulation.

Plaintiff also presents the following case authority in order to further demonstrate that none of the defenses that Defendant suggested on its Motion to Dismiss are actually applicable to this case.

This Court Has Personal Jurisdiction Over Defendant.

It is settled law that "due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *International Shoe v. Washington*, 326 U.S. 310, 66 S. Ct 154 (1945) citing *Milliken v. Meyer*, 311 U.S. 457, 463.

Here, OPEC has been conspiring with its member companies and the distributors and sellers of gasoline within the United States in order to fix the price of gasoline, as well as divide markets, within the United States.  Defendant sells crude oil and conspires with distributers and retailers within the United States in order to artificially inflate the price of oil and gasoline by limiting production, hampering distribution, fixing prices, and dividing markets.  The oil and gasoline is widely distributed to refineries and retailers where it enters the stream of commerce within the United States.  As just one example, nearly every vehicle in the United States runs on oil and gasoline which is supplied by Defendant.  This amounts to more than the "minimum contacts" that are required for this court to have general jurisdiction over Defendant.

Another case, *California Clippers, Inc. v. United States Soccer Football Asso.*, 314 F. Supp. 1057 (N.D. Cal. 1970), held that an unincorporated association, with foreign members, was subject to U. S. antitrust laws.  Specifically the court found that "[a]n unincorporated association "resides" in all those judicial districts in which it is doing business." *Id.* at 1063 *citing Rutland Railway Corp. v. Brotherhood of Locomotive Eng.*, 307 F.2d 21, 29 (2d Cir. 1962), cert. den., 372 U.S. 954, 9 L. Ed. 2d 978, 83 S. Ct. 949 (1963).  Here, OPEC, also an unincorporated association, has entered the stream of commerce by selling oil to refineries which

is then distributed to retailers across the entire country.  Defendant has chosen to sell its product throughout the United States and must therefore be held to the jurisdiction of the United States. Since oil from Defendant makes its way into the District of Columbia, Defendant "resides" and does business within this district.

Defendant may not simply profit off of the United States by selling its product within the U.S. boundaries and then seek antitrust immunity by claiming that it cannot be served because its headquarters is located in Austria.  To do so would be to render impotent U.S. antitrust law and its extraterritorial jurisdiction to prevent price-fixing and market division.  As in the *Swiss Watchmakers* case, and these other cited cases, OPEC must be held accountable under U.S. law and foreign law cannot shield it from liability before this court.

Act Of State Doctrine Does Not Apply.

The Act of State Doctrine, which Defendants mention in passing without going into detail, does not apply because in 1990, the Supreme Court strictly limited its application to cases in which a court is required to determine the legality of a sovereign state's official acts under that sovereign's own laws.  *W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, Int'l, 493 U.S. 400 (1990).  In that case, the Court held that the doctrine applies only when a suit requires a court to declare invalid a foreign governmental act performed within its territory and does not preclude inquiry into the motivations of a foreign government.  In *Kirkpatrick*, the Court reconfirmed that "Courts in the United States have the power, and ordinarily the obligation, to decide cases and controversies properly presented to them."  To the extent that a case involves the "official act of a foreign sovereign," the Act of State Doctrine applies only when a U.S. court

must declare such official act "invalid, and thus ineffective as a rule of decision for the courts of this country.'

Moreover, federal courts have continually and repeatedly held that U.S. courts are empowered, by necessity, to hear cases against foreign entities in antitrust litigation.  In *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), the court held that it was the intent of Congress to apply the antitrust laws to acts of aliens abroad. In this case a Canadian company had conspired with foreign producers of ignots to restrain interstate and foreign commerce of the United States.

In *United States v. Sisal Sales Corp.*, 274 U.S. 268 (1927), the U.S. Court of Appeals for the Second Circuit made clear that parties engaged in a conspiracy to control exports of the natural resource, sisal, from Mexico to the U.S., could be sued under the antitrust laws, despite the fact that Mexico had approved and authorized key aspects of the allegedly illegal operation in legislation. This principle was reaffirmed in *Hartford Fire Ins. v. California*, 509 U.S. 764 (1993), where the Supreme Court ruled that conspirators in the United Kingdom seeking to control the price of insurance contracts in the United States could find no protection from the antitrust laws from the fact that the United Kingdom had by legislation authorized the types of arrangements they had made.  This Supreme Court precedent mandates that OPEC can be sued in U.S. courts for violations of the nation's antitrust laws.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should respectfully be denied. Defendant has been properly served and is actively involved in the litigation. Any other possible

defenses are similarly meritless. It is the duty of this court to seek to enforce U. S. antitrust laws on Defendant, which has ripped off and is ripping off American consumers of oil and gasoline through its per se violations of U.S. antitrust law during these dire economic times in particular. OPEC should not be allowed to thumb its nose to American antitrust law! OPEC must be held legally to account. It is not above the law.

Dated: October 11, 2011

Respectfully Submitted,

  /s/ *Larry Klayman*
Larry Klayman, Esq.
D.C. Bar No. 334581
Freedom Watch, Inc.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com