**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| FREEDOM WATCH, INC. ) | |
| ) | |
| ) | Civil Action No. 1:12-cv-00731 (RBW) |
| *Plaintiff*, ) | Judge Reggie B. Walton |
| ) | |
| v. ) | |
| ) | |
| ORGANIZATION OF THE PETROLEUM ) | |
| EXPORTING COUNTRIES ) | |
| ) | |
| ) | |
| *Defendant.* ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO FREEDOM WATCH'S**
**MOTION FOR LEAVE TO SERVE DEFENDANT'S UNITED STATES COUNSEL**
**PURSUANT TO THE COURT OF APPEALS' DECISION TO**
**VACATE AND REMAND THE DISTRICT COURT'S RULING**

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................... 3

I.  In Exercising Its Discretion to Authorize Service Under Rule 4(f)(3), the Court
Should Consider Numerous Factors, Including Whether the Service Will Violate
U.S. Law, Foreign Law, or Customary International Law or Offend Due Process ............ 3

II.  The Court Should Not Exercise Its Discretion to Authorize Service on OPEC
Through Its U.S. Counsel Under Rule 4(f)(3) Where Service on OPEC Without
Its Consent Is Prohibited by International Agreement ......................................... 6

III.  The Court Should Not Exercise Its Discretion to Authorize Service on OPEC
Through Its U.S. Counsel Under Rule 4(f)(3) Where Doing So Would Cause
Substantial Affront to Austrian Law ................................................................. 11

    A.  Service on OPEC Through U.S. Counsel Occurs in Austria ................................. 11

    B.  Serving OPEC Through U.S. Counsel Would Violate Numerous
Provisions of Austrian Law and Cause Substantial Offense to Austrian
Sovereignty ................................................................................................ 15

    C.  This Court Should Reject Plaintiff's Request for Leave to Serve OPEC
through U.S. Counsel, Which Does Nothing to "Minimize" the Offense to
Austrian Law ............................................................................................. 20

IV.  The Court Should Not Exercise Its Discretion to Authorize Service on OPEC
Through Its U.S. Counsel Under Rule 4(f)(3) Where Such Service Would Be
Contrary to Customary International Law ......................................................... 25

V.  The Court Should Not Exercise Its Discretion to Authorize Service on OPEC
Through Its U.S. Counsel Under Rule 4(f)(3)Where Doing So Would Be
Fundamentally Unfair and Prejudicial to OPEC's Due Process Rights to Retain
Counsel and Contest this Court's Jurisdiction .................................................. 30

VI.  The Court Should Not Exercise Its Discretion to Authorize Service on OPEC
Through Its U.S. Counsel Under Rule 4(f)(3) Where Doing So Would Impair the
Foreign Policy Interests of the United States .................................................... 34

CONCLUSION ......................................................................................................... 37

## <u>TABLE OF AUTHORITIES</u>

<u>Federal Cases</u>                                                                    <u>Page(s)</u>

*767 Third Ave. Assocs. v. Permanent Mission*, 988 F.2d 295 (2d Cir. 1993)..................................9

*The Antelope*, 23 U.S. 66 (1825)...................................................28

*Broadbent v. Org. of Am. States*, 481 F. Supp. 907 (D.D.C. 1978), *aff'd*,
       628 F. 2d 27 (D.C. Cir. 1980).................................................. 26-27

*Brockmeyer v. May*, 383 F.3d 798 (9th Cir. 2004) ........................................4

*Brookshire Bros., Ltd. v. Chiquita Brands Int'l, Inc.*, No. 05-CIV-21962,
       2007 WL 1577771 (S.D. Fla. May 31, 2007) ..........................................22

*Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 111
       S. Ct. 922 (1991)...................................................7

*Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929 (D.C.
       Cir. 1988) ..............................................5, 25

*Elliott v. Archdiocese of New York*, 682 F.3d 213 (3d Cir. 2012) ................................7

*Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766
       F.3d 74 (D.C. Cir. 2014)............................................... *passim*

*Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 288
       F.R.D. 230 (D.D.C. 2013)............................................... *passim*

*Fujitsu Ltd. v. Belkin Int'l, Inc.*, 782 F. Supp. 2d 868 (N.D. Cal. 2011)..........................4, 12, 21

*In re Gary Aircraft Corp.*, 698 F.2d 775 (5th Cir. 1983)................................................4

*Gerber v. Riordan*, 649 F.3d 514 (6th Cir. 2011) ..................................27, 30

*Headfirst Baseball LLC v. Elwood*, 999 F. Supp. 2d 199 (D.D.C. 2013)....................................32

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S.
       694, 102 S. Ct. 2099 (1982)...................................................30

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 124 S. Ct.
       2466 (2004)...................................................36

*\* authorities on which counsel chiefly relies*

*J.B. Custom, Inc. v. Amadeo Rossi, S.A.*, No. 1:10-cv-326, 2011 WL 2199704 (N.D. Ind. June 6, 2011) ..........................................................................4

*Laker Airways Ltd. v. Pan Am. World Airways*, 103 F.R.D. 22 (D.D.C. 1984) ........................................................................................................33

*Lewis v. Dimeo Constr. Co.*, No. 14-10492, 2014 WL 4244330 (D. Mass. Aug. 26, 2014) ......................................................................... 20-21

*LG Elecs., Inc. v. ASKO Appliances, Inc.*, No. 08-828 (JAP), 2009 WL 1811098 (D. Del. June 23, 2009) .......................................................... 22-23

*Marcantonio v. Primorsk Shipping Corp.*, 206 F. Supp. 2d 54 (D. Mass. 2002) ..........................................................................................................5

*Marks v. Alfa Grp.*, 615 F. Supp. 2d 375 (E.D. Pa. 2009) ...................................5, 13, 21

*Martinez v. Aero Caribbean*, No. C 11-03194, 2014 WL 309589 (N.D. Cal. Jan. 28, 2014) ............................................................................... 5-6

*Mendaro v. World Bank*, 717 F.2d 610 (D.C. Cir. 1983) ........................................27

*Midmark Corp. v. Janak Healthcare Priv. Ltd.*, No. 3:14-cv-088, 2014 WL 1764704 (S.D. Ohio May 1, 2014) ..................................................4

*Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166 (3d Cir. 1995)...........................15

*Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222 (Fed. Cir. 2010) ..........................................................................................30

*Osborn v. Bank of the United States*, 9 Wheat. (22 U.S.) 738 (1824) ..........................4

*The Paquete Habana*, 175 U.S. 677, 20 S. Ct. 290 (1900).....................................5, 25

*Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 110 S. Ct. 456 (1989)..........................................................................................................7

*Pimentel v. Denman Inv. Corp.*, No. 05-cv-702, 2006 U.S. Dist. LEXIS 89517 (D. Colo. Dec. 8, 2006)............................................................21

*In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907 (N.D. Ill. 2009), *vacated*, *Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011)..............................23

*Prewitt Enters., Inc. v. Org. of the Petroleum Exporting Countries*, 353 F.3d 916 (11th Cir. 2003) ................................................................ *passim*

*Prewitt Enters., Inc. v. Org. of the Petroleum Exporting Countries*, No. CV-00-W-0865-S, 2001 WL 624789 (N.D. Al. Mar. 22, 2001) ............................................31

–iii–

*Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 105 S. Ct. 2757 (1985)....................................32

*Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007 (9th Cir. 2002) ...........................................22

*RSM Production Corp. v. Fridman*, No. 06 CIV. 11512 (DLC), 2007 WL
    2295907 (S.D.N.Y. Aug. 10, 2007) ..............................................................................................22

*Schooner Exch. v. McFaddon*, 11 U.S. 116 (1812) ........................................................................28

*Sosa v. Alvarez-Machain*, 542 U.S. 692, 124 S. Ct. 2739 (2004).........................................5, 25, 24

*United States v. Jordan*, 223 F.3d 676 (7th Cir. 2000) ..................................................................15

*United States v. Palestine Liberation Org.*, 695 F. Supp. 1456 (S.D.N.Y.
    1988) .............................................................................................................................................9

*U.S. Commodity Futures Trading Comm'n v. Aliaga*, 272 F.R.D. 617
    (S.D. Fla. 2011)..........................................................................................................................22

*Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970 (9th Cir. 2010) ..............................................7

Statutes & Rules

Case-Zablocki Act of 1972, Pub. L. No. 92-403, 86 Stat. 619, 1 U.S.C.
    § 112b (2012).................................................................................................................................9

Deep Seabed Hard Mineral Resources Act of 1980, Pub. L. No. 96-283,
    94 Stat. 553, 30 U.S.C. § 1411 (2012)........................................................................................9

FDA Food Safety Modernization Act of 2011, Pub. L. No. 111-353, 124
    Stat. 3885, 21 U.S.C. § 2252 (2012)..........................................................................................10

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat.
    2891, 28 U.S.C. § 1604 (2012) ....................................................................................................9

Hazardous and Solid Waste Amendments of 1984, Pub. L. No. 98-616, 98
    Stat. 3221, 42 U.S.C. § 6938(f) (2012) ...................................................................................9-10

Military Extraterritorial Jurisdiction Act of 2000, Pub. L. No. 106–523,
    114 Stat. 2488, 18 U.S.C. § 3263(a) (2012) ...........................................................................9, 10

Patents in Space Act of 1990, Pub. L. No. 101-580, 104 Stat. 2863, 35
    U.S.C. § 105(a) (2012)...........................................................................................................9, 10

Taiwan Relations Act of 1979, Pub. L. No. 96-8, 93 Stat. 14, 22 U.S.C.
    § 3303 (2012)................................................................................................................................9

Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948, 19
U.S.C. § 2241(a) (2012)...............................................................................9

Uniformed and Overseas Citizens Absentee Voting Act of 1986, Pub. L.
No. 99-410, 100 Stat. 924, 39 U.S.C. § 3406(a) (2012) ......................................9, 10

*Fed. R. Civ. P. 4(f) ................................................................................. *passim*

Fed. R. Civ. P. 4(h) ..............................................................................11, 14

Fed. R. Civ. P. 4(i) (1992) ...........................................................................10

Local Civ. R. 7 ..........................................................................................3


State Cases

*Derrickson v. Derrickson*, 541 A.2d 149 (D.C. 1988)...................................................32


Other Authorities

Agreement Between the United Nations and the United States of
America Regarding the Headquarters of the United Nations, June
26, 1947, 61 Stat. 756 ............................................................................. 8-9

*Amicus Curiae* Brief of the Republic of Austria, *Freedom Watch, Inc. v.
Org. of the Petroleum Exporting Countries*, 766 F.3d 74 (D.C. Cir.
2014) (No. 13-7019) ...............................................................................18, 29

*Amicus Curiae* Brief of the United States, *Spectrum Stores, Inc., v. CITGO
Petroleum Corp.*, 632 F.3d 938 (5th Cir. 2011) (No. 09-20084).......................... 25-26, 34, 35

Anne-Marie Slaughter, *A Global Community of Courts*, 44 Harv. Int'l L.J. 191
(2003).......................................................................................................36

Charter of the United Nations, June 26, 1945, 59 Stat. 1031, T.S. No. 993 ............................8, 28

*Corfu Channel (U.K. v. Alb.)*, 1949 I.C.J. 4 (Apr. 9)....................................................16

D.C. R. of Prof'l Conduct 1.2 (2007) ..................................................................33

Fed. R. Civ. P. 4, Advisory Comm. Notes, 1963 Amends., Subdiv. (i) .............................. *passim*

*Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f).......................................20

Hague Convention on the Service Abroad of Judicial and Extrajudicial
    Documents in Civil or Commercial Matters, Nov. 15, 1965, 658
    U.N.T.S. 165 .................................................................................................... 7, 28, 29, 35-36

Hague Convention Relating to Civil Procedure, Mar. 1, 1954, 286
    U.N.T.S. 267 ................................................................................................................ 28, 29, 36

*Headquarters Agreement Between the Republic of Austria and OPEC, 18
    Feb. 1974, 2098 U.N.T.S. 416 ........................................................................................ *passim*

*The Ministry*, Austrian Federal Ministry for Europe, Integration, and
    Foreign Affairs, http://www.bmeia.gv.at/en/the-ministry/ ......................................................3

*Restatement (Third) of the Foreign Relations Law of the United
    States (1987) ..................................................................................................7, 9, 15, 16, 28

Vienna Convention on the Law of Treaties Between States and International
    Organizations or Between International Organizations, Mar. 21, 1986, 25
    I.L.M. 543 (1986)...........................................................................................................................8

## INTRODUCTION[1]

On January 15, 2013, this Court issued a Memorandum Opinion (ECF No. 21) granting the Motion to Dismiss for Lack of Service of Process with Notice of Additional Defenses of Lack of Jurisdiction, Lack of Standing, and Failure to State a Claim, dated August 21, 2012 (ECF No. 5), by Defendant Organization of the Petroleum Exporting Countries ("OPEC" or "Defendant").   *See Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 288 F.R.D. 230 (D.D.C. 2013).   On September 12, 2014, the D.C. Circuit issued an Opinion affirming the findings by this Court that attempts by Plaintiff Freedom Watch, Inc. ("Plaintiff") to serve OPEC by mail and in person in Austria were ineffective and that Plaintiff's request to serve OPEC by email or fax should be rejected.   *Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74 (D.C. Cir. 2014).   The D.C. Circuit remanded for further consideration of the singular issue of whether this Court should exercise its discretion under Rule 4(f)(3) to permit OPEC to be served through U.S. counsel.   *Id.* at 84.

In its three-page Motion for Leave to Serve Defendant's United States Counsel Pursuant to the Court of Appeals' Decision to Vacate and Remand the District Court's Ruling, Plaintiff avers that the D.C. Circuit "has ruled, and is effectively advising this Court to allow [Plaintiff] to properly serve" Defendant's U.S. counsel, White & Case LLP, under Federal Rule of Civil Procedure 4(f)(3).   Pl.'s Mot. for Leave to Serve at 1 (ECF No. 24).   Nothing could be further from the truth.   In fact, the D.C. Circuit explicitly stated that "[o]ur decision to remand *should not be mistaken for agreement with Freedom Watch* that the district court *must* authorize some method of serving process on OPEC . . . ."   *Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014) (emphasis added).   The D.C. Circuit also observed that there is "no authority obligating a district

---

[1] In filing this Opposition, OPEC does not waive the immunities to which it or its Member States are entitled. OPEC reserves all of its objections to the jurisdiction of this Court in this case.

court to authorize an alternative method of service under Rule 4(f)(3) [including service on U.S. counsel] when there is no other available method to serve the defendant without its consent." *Id.*

Here, in deciding whether to authorize service of process on OPEC under Rule 4(f)(3), the Court must exercise its discretion taking into account numerous considerations, including that: (1) an international agreement, *i.e.* the OPEC Headquarters Agreement between OPEC and Austria, prohibits service on OPEC without the Secretary General of OPEC's consent; (2) Austrian law prohibits service on OPEC without its consent and without involvement of the Austrian Federal Ministry; (3) customary international law prohibits service on OPEC without its consent; (4) service on OPEC through its U.S. counsel effectively deprives OPEC of the counsel of its choice and thereby violates due process; and (5) authorizing service on OPEC under Rule 4(f)(3) adversely affects the foreign policy interests of the United States.  As discussed below, *see infra* Parts II-VI, all of these factors militate against the Court's authorization of service on OPEC through its U.S. counsel.

Notably, this Court, in an exercise of its discretion affirmed by the D.C. Circuit, has already determined that serving OPEC in Austria "would constitute a substantial affront to Austrian law." *Freedom Watch,* 766 F.3d at 82 (D.C. Cir. 2014) (citing *Prewitt Enters., Inc. v. Org. of the Petroleum Exporting Countries*, 353 F.3d 916, 927 (11th Cir. 2003)); *Freedom Watch,* 288 F.R.D. at 233 (D.D.C. 2013).  Service on OPEC through its U.S. counsel would necessarily take place in Austria, with counsel "function[ing] as a mechanism to transmit the service to [OPEC] abroad." *Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014).  OPEC's Austrian law expert, Wolfgang Hahnkamper, confirms that any service on OPEC through U.S. counsel would take place in Austria and result in significant violations of Austrian law.  Second Supplemental Declaration of Wolfgang Hahnkamper ("Hahnkamper Second Supp. Decl.") ¶¶ 5-

14.  The Austrian Government has also specifically stated that "service of process [on OPEC] through a counsel in the United States" is "contrary both to Austrian and international law." *Note Verbale* of the Austrian Federal Ministry for Europe, Integration, and Foreign Affairs[2] dated Dec. 5, 2014 ("2014 *Note Verbale*") (Second Supplemental Declaration of Abdalla Salem El-Badri ("El-Badri Second Supp. Decl."), Ex. 1).

As the *Prewitt* court found, with these violations of law and in particular Austria's prohibition of service on OPEC without consent of the OPEC Secretary General, any direction to serve process on OPEC under Rule 4(f)(3) "would constitute a clear abuse of discretion." *Prewitt,* 353 F.3d at 928 n.21.  Given the identical circumstances here, and for all of the reasons presented more fully below, this Court should reject Plaintiff's request for leave to serve OPEC through its U.S. counsel and dismiss Plaintiff's complaint.  Pursuant to Local Civil Rule 7(c), a proposed order is attached to this Opposition.

## ARGUMENT

I.  **IN EXERCISING ITS DISCRETION TO AUTHORIZE SERVICE UNDER RULE 4(F)(3), THE COURT SHOULD CONSIDER NUMEROUS FACTORS, INCLUDING WHETHER THE SERVICE WILL VIOLATE U.S. LAW, FOREIGN LAW, OR CUSTOMARY INTERNATIONAL LAW OR OFFEND DUE PROCESS**

Plaintiff requests that this Court grant it leave to serve process on OPEC through OPEC's U.S. counsel under Rule 4(f)(3).  Pl.'s Mot. for Leave to Serve at 2 (ECF No. 24).  Rule 4(f)(3) provides that a defendant "may be served at a place not within any judicial district of the United States: . . . by . . . means not prohibited by international agreement, as the court orders."  Fed. R. Civ. P. 4(f)(3).  The Advisory Committee Notes to Rule 4(f)(3) state that courts should make "an

---

[2]  Prior to March 1, 2014, the Austrian Federal Ministry for Europe, Integration, and Foreign Affairs was known as the Austrian Federal Ministry for European and International Affairs.  Prior to March 1, 2007, it was known as the Austrian Federal Ministry for Foreign Affairs.  *See The Ministry*, Austrian Federal Ministry for Europe, Integration, and Foreign Affairs, http://www.bmeia.gv.at/en/the-ministry/ (last visited Dec. 11, 2014).

earnest effort . . . to devise a method of communication that is consistent with due process and minimizes offense to foreign law."  Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f).

Rule 4(f)(3) leaves the question of whether to authorize service "by other means" to the sound discretion of the United States District Court.  *Freedom Watch*, 766 F. 3d at 81 (D.C. Cir. 2014) (quoting *Brockmeyer v. May*, 383 F.3d 798, 805 (9th Cir. 2004)).  But the Court's discretion is not unlimited.  "When [courts] are said to exercise a discretion, it is a mere legal discretion, a discretion to be exercised in discerning the course prescribed by law; and, when that is discerned, it is the duty of the Court to follow it."  *Osborn v. Bank of the United States*, 9 Wheat. (22 U.S.) 738, 866 (1824) (Marshall, C.J.).  "Within an area of discretion, . . . a judge is charged with determining what decision is dictated by more general rules of law."  *In re Gary Aircraft Corp.*, 698 F.2d 775, 781 (5th Cir. 1983).

The general rules guiding this Court's exercise of discretion are the text of Rule 4(f)(3) and the Advisory Committee Notes.  In line with those authorities, courts have rejected proposed alternative methods of service where they would violate international agreements, contradict express prohibitions of foreign law, or infringe the requirements of due process.  *See, e.g.*, *Fujitsu Ltd. v. Belkin Int'l, Inc.*, 782 F. Supp. 2d 868, 878-80 (N.D. Cal. 2011) (declining to exercise Rule 4(f)(3) discretion to authorize service on counsel that would conflict with Taiwanese law); *J.B. Custom, Inc. v. Amadeo Rossi, S.A.*, No. 1:10-cv-326, 2011 WL 2199704, at *6-7 (N.D. Ind. June 6, 2011) (declining to exercise Rule 4(f)(3) discretion to authorize service "in a manner that Brazil has apparently resisted for decades"); *Midmark Corp. v. Janak Healthcare Priv. Ltd.*, No. 3:14-cv-088, 2014 WL 1764704, at *3 (S.D. Ohio May 1, 2014) (declining to exercise Rule 4(f)(3) discretion to authorize service where "[c]oncern for comity

and respect for the legal system of India" were "foremost in the Court's mind"); *cf. Marks v. Alfa Grp.*, 615 F. Supp. 2d 375, 379-80 (E.D. Pa. 2009) (exercising discretion to authorize Rule 4(f)(3) service by registered mail in Liechtenstein where the Principality was not "party to any international agreement prohibiting service by international mail" and did not "expressly prohibit service by registered mail").

Further, in dealing with issues involving an international organization such as OPEC, courts should also fully consider any violations of customary international law or adverse effects upon United States foreign policy interests. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 733-34, 124 S. Ct. 2739, 2766 (2004) (holding that where there is "'no controlling executive or legislative act,'" the United States courts should abide by "the current state of international law") (quoting *The Paquete Habana*, 175 U.S. 677, 700, 20 S. Ct. 290 (1900)); *id.* at 733-34 & n.21 (explaining that where "[t]he Government of [a foreign State] has said that these cases interfere with the policy embodied by its [legislation]" and "[t]he United States has agreed," "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy"); *Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988) (noting that "where there is . . . no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of nations" (quotation marks and emphasis omitted)).

Courts also consider, in the context of deciding whether to authorize service upon counsel, whether the attorney is authorized to accept such service. *See, e.g.*, *Marcantonio v. Primorsk Shipping Corp.*, 206 F. Supp. 2d 54, 57 (D. Mass. 2002) (declining to exercise Rule 4(f)(3) discretion to authorize service where plaintiff "cannot show that . . . [defendant's] attorneys had authority to accept service on behalf of [defendant]"); *Martinez v. Aero Caribbean*,

No. C 11-03194, 2014 WL 309589, at *3-4 (N.D. Cal. Jan. 28, 2014) (declining to exercise Rule 4(f)(3) discretion to authorize service where "there [was] no showing that Attorney Zamora was authorized to accept service in this action").  This Court has already determined that OPEC never authorized its U.S. counsel to accept service.  *See Freedom Watch*, 288 F.R.D. at 233 (D.D.C. 2013).

Here, each of the factors to be considered weighs heavily against authorizing Rule 4(f)(3) service on OPEC through its U.S. counsel.  Accordingly, the Court should deny Freedom Watch's motion to serve OPEC under Rule 4(f)(3) and reaffirm the dismissal of Freedom Watch's Complaint.

**II.     THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO AUTHORIZE SERVICE ON OPEC THROUGH ITS U.S. COUNSEL UNDER RULE 4(F)(3) WHERE SERVICE ON OPEC WITHOUT ITS CONSENT IS PROHIBITED BY INTERNATIONAL AGREEMENT**

Rule 4(f)(3) permits service outside the United States only by use of "means not prohibited by international agreement."  Fed. R. Civ. P. 4(f)(3).  Federal courts should therefore avoid violating international agreements when considering whether to authorize service under Rule 4(f)(3).  As explained below, the OPEC Headquarters Agreement is an "international agreement" under Rule 4(f)(3), and therefore any alternative method of service permitted under Rule 4(f)(3) must not be prohibited by the terms of the OPEC Headquarters Agreement.  But the OPEC Headquarters Agreement states that "[t]he service of legal process . . . shall not take place . . . except with the express consent of, and under conditions approved by, the Secretary General."  Headquarters Agreement Between the Republic of Austria and OPEC ("OPEC Headquarters Agreement") art. 5(2), 18 Feb. 1974, 2098 U.N.T.S. 416 (I-36477) (Supplemental Opinion of Judge Stephen M. Schwebel ("Schwebel Supp. Op."), Ex. 10).  This Court, therefore, should not authorize any method of service on OPEC without its consent under Rule 4(f)(3).

The term "international agreement" is not defined in Rule 4 or in any of the other Federal Rules.  The 1993 Advisory Committee Note to Rule 4(f)(3) explains:

> Paragraph (3) authorizes the court to approve other methods of service not prohibited by international agreements.  The Hague Convention, for example, authorizes special forms of service in cases of urgency if convention methods will not permit service within the time required by the circumstances. . . .  [T]he court may direct a special method of service not explicitly authorized by international agreement if not prohibited by the agreement.

Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f).  The 1993 Advisory Committee Note refers in this passage to "international agreements" in the plural, and refers to the Hague Service Convention as only one "example."  *Id.*  Thus, the Hague Service Convention is not the only treaty that would fall under Rule 4(f)(3) and there are no other express limitations on what other instruments could be included so long as they satisfy the broad definition of an "international agreement."

Unless a term is expressly defined, the terms used in the Federal Rules of Civil Procedure are to be interpreted and applied according to their "plain meaning."  *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 540-41, 111 S. Ct. 922, 928 (1991) (quoting *Pavelic & LeFlore v. Marvel Entm't Grp.*, 493 U.S. 120, 123, 110 S. Ct. 456,  458 (1989)); *Elliott v. Archdiocese of New York*, 682 F.3d 213, 225 (3d Cir. 2012); *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).  Here, the OPEC Headquarters Agreement falls within the ordinary meaning of the term "international agreement."  Section 301 of the Restatement (Third) of the Foreign Relations Law of the United States (1987) (hereinafter "Restatement"), for example, defines an "international agreement" as any "agreement between two or more states or international organizations that is intended to be legally binding and is governed by international law."

All of these elements are satisfied by the OPEC Headquarters Agreement.  It was signed

by a state (Austria) and an international organization (OPEC, which itself comprises sovereign member states). It was also intended to be legally binding and governed by international law, as evidenced by its express references to "international law" and "the appointment of . . . arbitrators . . . designated . . . by the President of the International Court of Justice" in the event of a dispute about its "interpretation or application." *See* OPEC Headquarters Agreement arts. 26, 29 (Schwebel Supp. Op., Ex. 10).

The OPEC Headquarters Agreement's status as an "international agreement" under Rule 4(f)(3) is further confirmed by its status as an international agreement under Austrian and international law. Schwebel Supp. Op. ¶ 30; Hahnkamper Second Supp. Decl. ¶ 20. As Judge Schwebel explains, the OPEC Headquarters Agreement constitutes an international agreement under the definition of "international agreement" set forth in the 1986 Vienna Convention on the Law of Treaties Between States and International Organizations or Between International Organizations. Schwebel Supp. Op. ¶ 30; *see* Vienna Convention on the Law of Treaties Between States and International Organizations or Between International Organizations art. 2(1)(a)(i), Mar. 21, 1986, 25 I.L.M. 543 (1986) (Schwebel Supp. Op., Ex. 9).[3]

Mr. Hahnkamper also explains that the OPEC Headquarters Agreement is an international agreement under Austrian law, as it was approved by the Austrian Parliament in accordance with the Austrian Constitution, and implementation of the OPEC Headquarters Agreement is assigned to the Ministry of the Austrian Government responsible for foreign relations and international affairs. Hahnkamper Second Supp. Decl. ¶¶ 17-20. In that way, the OPEC Headquarters Agreement is much like the United Nations Headquarters Agreement, *see*

---

[3] Judge Schwebel also emphasizes that, after its entry into force, the OPEC Headquarters Agreement was presented by Austria to the Secretary General of the United Nations for registration under Article 102 of the United Nations Charter, which provides that "[e]very treaty and every international agreement entered into by any Member of the United Nations . . . shall . . . be registered with the Secretariat and published by it." *See* Schwebel Supp. Op. ¶ 32; Charter of the United Nations art. 102, June 26, 1945, 59 Stat. 1031, T.S. No. 993 (ECF No. 8 at 31).

Agreement Between the United Nations and the United States of America Regarding the Headquarters of the United Nations, June 26, 1947, 61 Stat. 756, which the federal courts have described as an "international agreement" in several decisions. *See e.g.*, *767 Third Ave. Assocs. v. Permanent Mission*, 988 F.2d 295, 297 (2d Cir. 1993); *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1458 n.2 (S.D.N.Y. 1988).

Nothing in Rule 4(f)(3) indicates that the term "international agreement" is restricted to international agreements to which the United States is a signatory. The Restatement carefully distinguishes between "international agreements" in general, which are defined broadly in Section 301 of the Restatement, and "international agreements of the United States," which are subject to the unique domestic regime described under Section 303 of the Restatement. *See* Restatement § 303 ("[T]he President, with the advice and consent of the Senate, may make any *international agreement of the United States* in the form of a treaty . . . .") (emphasis added).

Indeed, where a provision of federal law is restricted to include only those "international agreements *to which the United States is a party*," *see, e.g.*, 19 U.S.C. § 2241(a)(2)(C) (2012) (emphasis added), this limitation is made explicit in the text. For instance, such express limitations are found in the Case-Zablocki Act of 1972, the Foreign Sovereign Immunities Act of 1976, the Deep Seabed Hard Mineral Resources Act of 1980, the Uniformed and Overseas Citizens Absentee Voting Act of 1986, the Patents in Space Act of 1990, the Military Extraterritorial Jurisdiction Act of 2000, and numerous other federal statutes.[4]   Given the

---

[4] *See, e.g.*, Case-Zablocki Act of 1972, Pub. L. No. 92-403, 86 Stat. 619 (codified in relevant part at 1 U.S.C. § 112b (2012)) ("any international agreement . . . to which the United States is a party"); Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891 (codified in relevant part at 28 U.S.C. § 1604 (2012)) ("international agreements to which the United States is a party"); Taiwan Relations Act of 1979, Pub. L. No. 96-8, 93 Stat. 14 (codified in relevant part at 22 U.S.C. § 3303(c) (2012)) ("international agreements . . . entered into by the United States"); Deep Seabed Hard Mineral Resources Act of 1980, Pub. L. No. 96-283, 94 Stat. 553 (codified in relevant part at 30 U.S.C. § 1411(a)(1)(C) (2012)) ("an international agreement which is in force with respect to the United States"); Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948 (codified in relevant part at 19 U.S.C. § 2241(a)(2)(C) (2012)) ("international agreements to which the United States is a party"); Hazardous and Solid

absence of any such limitation, there is no reason for a court to read into Rule 4(f)(3) any implicit limitation that the reference to "international agreement" refers only to "international agreements of the United States."

The policies underlying Rule 4(f)(3) provide further support affording deference to international agreements including those to which the United States is not a party. This was addressed by the Eleventh Circuit in *Prewitt*, 353 F.3d at 927 n.19, which discussed the differences between Rule 4(f) and its pre-1993 predecessor, Rule 4(i)(1). The old text of Rule 4 made no reference to any "international agreement," and stated simply at Rule 4(i)(1)(E) that service could be authorized "as directed by order of the court." As explained in *Prewitt*, "the 1993 amendments to the Federal Rules on service specifically provided for greater deference *generally to foreign law*." 353 F.3d at 927 n.19 (emphasis added). Thus the amendment that resulted in Rule 4(f)(3) and its new reference to "international agreement" was added to give effect to the federal policy of respect and deference "generally to foreign law" and not only to the international agreements of the United States.

Because the OPEC Headquarters Agreement constitutes an international agreement as contemplated by Rule 4(f)(3), and specifically prohibits service on OPEC without its consent, this court should not authorize service on OPEC—through U.S. counsel or otherwise—under Rule 4(f)(3).

---

Waste Amendments of 1984, Pub. L. No. 98-616, 98 Stat. 3221 (codified in relevant part at 42 U.S.C. § 6938(f) (2012)) ("an international agreement between the United States and the government of the receiving country"); Uniformed and Overseas Citizens Absentee Voting Act of 1986, Pub. L. No. 99-410, 100 Stat. 924 (codified in relevant part at 39 U.S.C. § 3406(a)(2) (2012)) ("international agreement of the United States"); Patents in Space Act of 1990, Pub. L. No. 101-580, 104 Stat. 2863 (codified in relevant part at 35 U.S.C. § 105(a) (2012)) ("international agreement to which the United States is a party"); Military Extraterritorial Jurisdiction Act of 2000, Pub. L. No. 106–523, 114 Stat. 2488 (codified in relevant part at 18 U.S.C. § 3263(a)(2) (2012)) ("international agreement to which the United States is a party"); FDA Food Safety Modernization Act of 2011, Pub. L. No. 111-353, 124 Stat. 3885 (codified in relevant part at 21 U.S.C. § 2252 (2012)) ("international agreement to which the United States is a party").

III.    **THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO AUTHORIZE SERVICE ON OPEC THROUGH ITS U.S. COUNSEL UNDER RULE 4(F)(3) WHERE DOING SO WOULD CAUSE SUBSTANTIAL AFFRONT TO AUSTRIAN LAW**

This Court should also decline to authorize service of process through OPEC's U.S. counsel, because such service would constitute a substantial offense to Austrian law.  As the D.C. Circuit noted, leave to serve OPEC through its U.S. counsel may only be granted in accord with Rule 4(f)(3), and only if such service "would 'minimize' offense to Austrian law." *Freedom Watch,* 766 F.3d at 84 (D.C. Cir. 2014) (quoting Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f)).  In its three-page Motion, Plaintiff does not even address Austrian law, let alone show how serving OPEC through its U.S. counsel would "minimize" the offense done to Austrian law.  Indeed, service through U.S. counsel would result in the same substantial affront to Austrian law as Plaintiff's other proposed methods of service, which this Court has already rejected.  *Freedom Watch,* 288 F.R.D. at 233 (D.D.C. 2013).  Accordingly, the Court should reject Plaintiff's request to serve OPEC through its U.S. counsel, a method that does nothing to minimize the violation of Austrian law.

A.    **Service on OPEC Through U.S. Counsel Occurs in Austria**

As Plaintiff admits, Pl.'s Mot. for Leave to Serve at 1-2 (ECF No. 24) (quoting Fed. R. Civ. P. 4(f)), the express terms of Rule 4(f) limit the applicability of that rule to service "at a place not within any judicial district of the United States"[5]:

> **(f) Serving [a Defendant] in a Foreign Country**.  Unless federal law provides otherwise, [a defendant] . . . may be served *at a place not within any judicial district of the United States*:

---

[5] The text of Rule 4(f) refers only to service on "an individual."  Although OPEC is an international organization, rather than an individual, Rule 4(f) is applicable to service on OPEC under Rule 4(h)(2), which permits service on a foreign unincorporated association "at a place not within any judicial district of the United States, in any manner prescribed by Rule 4(f) for serving an individual, except personal delivery under (f)(2)(C)(i)."  *See* Fed. R. Civ. P. 4(f) & 4(h)(2).  As the D.C. Circuit confirmed in its 2014 Opinion, OPEC is a "foreign unincorporated association." *Freedom Watch*, 766 F.3d at 79 (D.C. Cir. 2014).

(1)  by any internationally agreed means of service . . . ;[6]

(2)  . . . as prescribed by the foreign country's law for service . . . [or] as the foreign authority directs in response to a letter rogatory . . . ;[7] or

(3)  by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f) (emphasis added).  The limitation in the chapeau to service "at a place not within any judicial district of the United States" applies to all of the subsections of Rule 4(f), including Rule 4(f)(3).  *See Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014).

Accordingly, courts considering service through U.S. counsel under Rule 4(f)(3) have recognized that the service is effectuated not at the location of U.S. counsel but at the location of the foreign defendant, and therefore, consideration of the law of the defendant's foreign jurisdiction was necessary.  For example, in *Fujitsu Ltd. v. Belkin International, Inc.*, the plaintiff requested that the court order service under Rule 4(f)(3) on the U.S. counsel of defendants who were located in Taiwan.   782 F. Supp. 2d 868, 878-80 (N.D. Cal. 2011).   Although the defendants' U.S. counsel was located in California, the *Fujitsu* court undertook an analysis to determine whether the law of Taiwan was violated by the method of service requested.  *Id.* Ultimately, the court concluded that it was "inappropriate to order service on [defendants] through their U.S. counsel [in] a manner that is not prescribed by Taiwanese law." *Id.* at 881. The fact that the *Fujitsu* court decided to conduct an inquiry into the requirements of Taiwanese law confirms that service through U.S. counsel under Rule 4(f)(3) was effectuated in Taiwan, and not California.

---

[6] The D.C. Circuit concluded that service was improper under Rule 4(f)(1).  *Freedom Watch*, 766 F.3d at 79 (D.C. Cir. 2014).

[7] The D.C. Circuit concluded that service was improper under Rule 4(f)(2).  *Id.* at 79-80.

Although the D.C. Circuit expressly declined to come to any conclusions on the issue in its 2014 Opinion, it, too, recognized that service under Rule 4(f)(3) could not be effectuated in the United States and that service ultimately would need to be transmitted "abroad":

> [W]hile Rule 4(f)(3) addresses service only "at a place not within any judicial district of the United States," Fed. R. Civ. P. 4(f), arguably, when a court orders service on a foreign entity through its counsel in the United States, *the attorney functions as a mechanism to transmit the service to its intended recipient abroad.*

*Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014) (emphasis added).   Under this reasoning, service is effectuated "abroad," and a defendant's U.S. counsel serves as a mere "mechanism to transmit the service," not unlike other mechanisms such as hand delivery, mail, email, or facsimile.   Each of these mechanisms of service may be initiated at its place of transmittal in the United States, but the service is only accomplished when the service is transmitted "to its intended recipient abroad."   *Id.*; *see also Marks v. Alfa Grp.*, 615 F. Supp. 2d 375, 378-80 (E.D. Pa. 2009) (evaluating "[s]ervice by international mail" under the laws of Liechtenstein, where the mail was received, rather than the law of Pennsylvania, where the mail was sent).

In this case, the foreign country to which OPEC's U.S. counsel would "transmit" service is Austria.   As OPEC's Secretary General, Abdalla Salem El-Badri, has explained, OPEC has been headquartered in Vienna since before 1974, when OPEC and Austria entered into the OPEC Headquarters Agreement.   El-Badri Decl. ¶ 13 (ECF No. 6); *see also* OPEC Headquarters Agreement (Schwebel Supp. Op., Ex. 10).   OPEC's property, staff, and assets are located exclusively in Vienna and virtually all of its business and operations take place in Austria.   El-Badri Decl. ¶ 18 (ECF No. 6).   OPEC does not conduct any operations or engage in any business in the United States nor does OPEC have any officers, staff, property, financial assets, or other presence in the United States.   *Id.*   These facts are not disputed and have been accepted by this Court and the D.C. Circuit.   *See* Pl.'s Opp'n to Def.'s Mot. to Dismiss 2-5 (ECF No. 17);

*Freedom Watch*, 288 F.R.D. at 232 (D.D.C. 2013); *Freedom Watch*, 766 F.3d at 77 (D.C. Cir. 2014).

While Plaintiff has admitted that under Rule 4(f)(3) OPEC must be served outside the United States, Pl.'s Mot. for Leave to Serve 1-2 (ECF No. 24) (quoting Fed. R. Civ. P. 4(f)), Plaintiff also states that "White & Case is Defendant's representative and located in the United States," Pl.'s Mot. for Leave to Serve at 3 (ECF No. 24).  The only way to serve OPEC in the United States, however, would be under Rule 4(h)(1), which provides:

> **(h) Serving a Corporation, Partnership, or Association.**  Unless federal law provides otherwise or the defendant's waiver has been filed, a domestic or foreign corporation, or a partnership or other unincorporated association that is subject to suit under a common name, must be served:
>
> (1) *in a judicial district of the United States*:
>
>> (A) in the manner prescribed by Rule 4(e)(1) for serving an individual; or
>>
>> (B) by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or *any other agent authorized by appointment or by law to receive service of process* and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant . . . .

Fed. R. Civ. P. 4(h) (emphasis added).  Thus, under Rule 4(h)(1), OPEC may only be served in the United States through an agent "authorized by appointment or by law to receive service of process."  *Id.* at 4(h)(1).  This Court has already "ruled that OPEC 'could not have been validly served through its counsel' under Rule 4(h)(1)," *see Freedom Watch*, 766 F.3d at 82 (D.C. Cir. 2014) (quoting *Freedom Watch*, 288 F.R.D. at 233 (D.D.C. 2013)), as OPEC has "never authorized White & Case, its law firm, to accept or receive service of process on its behalf." *Freedom Watch*, 288 F.R.D. at 233 (D.D.C. 2013) (internal quotation marks, citation, and alterations omitted).  The D.C. Circuit found that "there is no basis for questioning [this Court's]

–14–

conclusion as a matter of interpreting Rule 4(h)(1)." *See Freedom Watch*, 766 F.3d at 83 (D.C. Cir. 2014).

Accordingly, the only way for service to occur through U.S. counsel under Rule 4(f)(3) is if such service occurs in Austria and counsel acts merely as a "mechanism to transmit the service to" OPEC in Austria. *See id.* at 84. Austrian law would also consider such service through U.S. counsel to take place in Austria, as OPEC's Austrian law expert, Mr. Wolfgang Hahnkamper, confirms. Hahnkamper Second Supp. Decl. ¶¶ 5-7. "[U]nder Section 9(3) of the Austrian Federal Service of Documents Act, service of process on an Austrian defendant is not effectuated until 'the moment in which the document has in effect been served to the authorized recipient.'" *Id.* ¶ 6. In the present case, however, there is no agent authorized by OPEC to receive service of process in the United States. *Id.* ¶ 7; *see also* El-Badri Decl. ¶ 15 (ECF No. 6); El-Badri Supp. Decl. ¶ 4 (ECF No. 19-1). The consequence, as Mr. Hahnkamper explains, is that "any attempted transmittal of service from the United States to OPEC would inevitably cross Austria's territorial boundaries and take place in Austria" and "such attempted transmittal of service would necessarily be subject to Austrian law." Hahnkamper Second Supp. Decl. ¶ 7. So under both the Federal Rules of Civil Procedure and Austrian law, service on OPEC through its U.S. counsel would take place in Austria and be subject to Austrian law.

### B.     Serving OPEC Through U.S. Counsel Would Violate Numerous Provisions of Austrian Law and Cause Substantial Offense to Austrian Sovereignty

Because service through U.S. counsel would occur in Austria's territory, Austria "has jurisdiction to prescribe law" governing such service. Restatement § 402(1)(a); *see United States v. Jordan*, 223 F.3d 676, 693 (7th Cir. 2000) (citing Restatement § 402(1)(a)); *Neely v. Club Med Mgmt. Servs., Inc.*, 63 F.3d 166, 184-85 (3d Cir. 1995) (same); *see also infra* Part III. As explained in the Restatement, "a state's lawful control over its territory" entails "authority to

govern in that territory, and authority to apply law there."  Restatement § 206 & cmt. b.  Judge Stephen M. Schwebel likewise confirms in his Supplemental Opinion that, according to the International Court of Justice, "'[b]etween independent States, respect for territorial sovereignty is an essential foundation of international relations.'"  Schwebel Supp. Op. ¶ 19 (quoting *Corfu Channel (U.K. v. Alb.)*, 1949 I.C.J. 4, 35 (Apr. 9)).

In remanding this case, the D.C. Circuit found that Austrian law was relevant to whether service on U.S. counsel should be authorized under Rule 4(f)(3) and stated that this Court should only "authorize such service [on U.S. counsel] if it would 'minimize' offense to Austrian law." *Freedom Watch,* 766 F.3d at 84 (D.C. Cir. 2014) (quoting Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f)).  This is in accord with the Advisory Committee's Notes, which state that in considering service under Rule 4(f)(3), "an earnest effort should be made to devise a method of communication that is consistent with due process and *minimizes offense to foreign law*." Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f) (emphasis added).

In its 2013 Memorandum Opinion, this Court conducted a Rule 4(f)(3) inquiry into the requirements for service on OPEC pursuant to Austrian law.  As the Court explained:

> Austrian law specifically prohibits (1) direct service from abroad by private parties; (2) service of process on an international organization without the involvement of the Austrian Federal Ministry; and (3) any service of process on OPEC without the express consent of the Secretary General of OPEC . . . .

*Freedom Watch*, 288 F.R.D. at 232 (D.D.C. 2013) (internal citation and quotation marks omitted).  The D.C. Circuit accepted this formulation of Austrian law, *Freedom Watch*, 766 F.3d at 80 (D.C. Cir. 2014),[8] as the Eleventh Circuit had previously accepted in *Prewitt*, 353 F.3d at

---

[8] "[B]ecause Austrian courts had no involvement with either of Freedom Watch's attempts to serve OPEC in Austria, those efforts were not 'prescribed by' Austrian law governing service of process. . . . Freedom Watch's

923-26.

This Court's 2013 Memorandum Opinion followed the reasoning of *Prewitt* in determining that because service by email or fax "without OPEC's consent and in violation of the OPEC Headquarters Agreement[] 'would constitute a substantial affront to Austrian law,'" *Freedom Watch*, 766 F.3d at 82 (D.C. Cir. 2014) (quoting *Prewitt*, 353 F.3d at 927), service by email and fax should not be allowed under Rule 4(f)(3). *Freedom Watch*, 288 F.R.D. at 232 (D.D.C. 2013). The D.C. Circuit held that this Court properly exercised its discretion in rejecting Plaintiff's request to serve OPEC by email or fax. *Freedom Watch*, 766 F.3d at 82 (D.C. Cir. 2014).

As Mr. Hahnkamper explains in his expert declaration, however, "transmittal of service to OPEC through US counsel *would cause precisely the same violations*" of Austrian law as the methods of service previously rejected by this Court. Hahnkamper Second Supp. Decl. ¶ 9 (emphasis added). Mr. Hahnkamper explains that service on OPEC through its U.S. counsel would result in four significant violations of Austrian law:

(1) It would violate the OPEC Headquarters Agreement, which "prohibits . . . US counsel from transmitting service of process to OPEC in Austria without the consent of the OPEC Secretary General." *Id.* ¶ 10.

(2) It would violate Section 11 of the Austrian Federal Service of Documents Act, which prohibits service through U.S. counsel to OPEC "without involvement and approval of the Austrian Federal Ministry." *Id.*

(3) It would violate Section 12 of the Austrian Federal Service of Documents Act, which "prohibits US counsel from transmitting service of process to any resident of Austria, including OPEC, without the involvement of an Austrian court." *Id.*

(4) It would violate Austrian law "regulating the identity of the process server," as U.S.

---

attempts in fact violated Austrian law. Austria prohibits service of process on an international organization holding privileges and immunities under international law (which OPEC does) without the involvement of the Austrian Federal Ministry. . . . In addition, the OPEC Headquarters Agreement, a part of Austrian law, bars service of legal process within the headquarters seat without the express consent of OPEC's Secretary General." *Freedom Watch*, 766 F.3d at 80 (D.C. Cir. 2014).

counsel is not a process server under Austrian law and "service is a governmental function." *Id.*

The Austrian Government has also emphasized these violations in its recent *Note Verbale*, where it clearly states that "*any other form of service on OPEC*" that is not performed in accordance with the Austrian Federal Service of Documents Act and the OPEC Headquarters Agreement "is to be considered contrary to both Austrian an[d] to international law." 2014 *Note Verbale* (El-Badri Second Supp. Decl., Ex. 1) (emphasis added). "This holds also true for service of process through a counsel in the United States appointed under Rule 4(f)(3) . . . ." *Id.* As the Austrian Government has previously noted, "Austria regards the direct service of foreign legal documents in her territory by foreign authorities or by private individuals without the assistance or explicit or implicit consent of the competent Austrian authorities as an infringement of her sovereignty." *Note Verbale* of the Austrian Federal Ministry for Foreign Affairs dated January 7, 2003 ("2003 *Note Verbale*") (ECF No. 7 at 219-21).

These prohibitions of Austrian law apply just as surely to service through U.S. counsel as they apply to service by email or by fax. Indeed, regardless of U.S. counsel's participation, service of process still constitutes "a judicial act that may be exerted only by a court in Austria", *see* Declaration of Wolfgang Hahnkamper ("Hahnkamper Decl.") ¶ 13 (ECF No. 7), and which cannot lawfully be undertaken "by foreign authorities or by private individuals." *See Amicus Curiae* Brief of the Republic of Austria at 2, *Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74 (D.C. Cir. 2014) (No. 13-7019) (Schwebel Supp. Op., Ex. 5). Whether U.S. counsel constitutes a purely private actor or an officer of this Court for the purposes of Austrian law, U.S. counsel cannot transmit process to OPEC without usurping a purely sovereign function in Austria.

Additionally, U.S. counsel also would be acting without the involvement or consent of

the Austrian Federal Ministry. *See* 2014 *Note Verbale* (El-Badri Second Supp. Decl., Ex. 1). As the Court held in *Prewitt*, "[t]here would be no way . . . to serve OPEC under § 11(2) of the Austrian Service Act because we must assume that if [any party attempting service] had gone to the Austrian Federal Ministry of Foreign Affairs, the Ministry would have applied the laws of its own country and obeyed the dictates of the [OPEC Headquarters Agreement] prohibiting service without OPEC's consent." *Prewitt*, 353 F.3d at 926.

As set forth under Article 5(2) of the OPEC Headquarters Agreement, "service of legal process . . . shall not take place within the headquarters seat except with the express consent of, and under conditions approved by, the Secretary General." *See* OPEC Headquarters Agreement art. 5(2) (Schwebel Supp. Op., Ex. 10). The OPEC Headquarters Agreement "was approved by the Austrian Parliament in accordance with Article 50 of the Austrian Constitution" and is consequently "an integral part of Austrian law." 2014 *Note Verbale* (El-Badri Second Supp. Decl., Ex. 1). If U.S. counsel were to attempt to transmit service to OPEC, however, U.S. counsel also would be acting without the consent of the OPEC Secretary General and, in fact, in direct contravention of OPEC's explicit directions. *See id.* ("OPEC has not authorized a counsel in the United States to accept service of process on its behalf"); El-Badri Decl. ¶ 15 (ECF No. 6). U.S. counsel therefore cannot transmit service in the present case without violating this integral part of Austrian law.

Finally, as Mr. Hahnkamper adds, U.S. counsel is also prohibited from attempting to act as the process server, which would constitute usurpation of an Austrian governmental function and thus result in an offensive act in the territory of Austria. *See* Hahnkamper Second Supp. Decl. ¶ 10. Whether viewed as wholly private parties or as the officers of a foreign court, U.S. attorneys are plainly not Austrian governmental entities or officials, and are not allowed to serve

process on individuals or entities in Austria.

Accordingly, service through U.S. counsel would result in undeniable violations of Austrian law. Notably, the provisions of Austrian law violated by such service are precisely the same provisions of Austrian law that would have been violated by the methods of service previously proposed by Plaintiff and rejected by this Court, including service by email or fax. Indeed, if ordered to do so, U.S. counsel would likely "transmit the service" to OPEC in Austria, *see Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014), via email or fax, resulting in an identical "substantial affront to Austrian law" that led both this Court and the *Prewitt* court to deny alternative service under Rule 4(f)(3).

**C.     This Court Should Reject Plaintiff's Request for Leave to Serve OPEC through U.S. Counsel, Which Does Nothing to "Minimize" the Offense to Austrian Law**

As the *Prewitt* court noted, "the 1993 amendments to the Federal Rules on service specifically provided for greater deference generally to foreign law." *Prewitt*, 353 F.3d at 927 n.19. Accordingly, the 1993 Advisory Committee Note explains that a federal court should exercise its discretion under Rule 4(f)(3) to authorize only methods of serving process that "minimize[] offense to foreign law." Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f). Indeed, as the Advisory Committee has elsewhere observed, "the possibilities of securing ultimate enforcement of the judgment abroad" are directly dependent upon avoiding any serious "objection in the place of service." *Id.*, 1963 Amends., Subdiv. (i)(1). Federal courts have therefore authorized service of process under Rule 4(f)(3) exclusively in situations where no serious offense to foreign law would result. In the present case, therefore, this Court must deny Plaintiff's Motion because service on OPEC through U.S. counsel would constitute a substantial affront to Austrian law.

Many federal courts have concluded, as in *Lewis v. Dimeo Construction Co.*, that there is

"little difference between the phrase 'not prohibited by foreign law' and 'minimiz[ing] offense to foreign law.'" No. 14-10492, 2014 WL 4244330, at *3 (D. Mass. Aug. 26, 2014). On the same basis, the court in *Fujitsu* concluded that it would be "inappropriate to order service on [the foreign defendant] through their U.S. counsel, a manner [of service] that is not prescribed by Taiwanese law." 782 F. Supp. 2d at 881. The court in *Pimentel v. Denman Investment Corp.* likewise concluded that "service can be authorized" under Rule 4(f)(3) only "as long as it is not prohibited by those laws" applicable to service of process in the foreign jurisdiction. No. 05-cv-702, 2006 U.S. Dist. LEXIS 89517, at *3 (D. Colo. Dec. 8, 2006). In *Marks v. Alfa Group*, the court concluded that it could only issue "an order pursuant to Rule 4(f)(3) approving service by registered mail" as the law of Liechtenstein "does not expressly prohibit service by registered mail." 615 F. Supp. 2d at 378-80.

In *Prewitt*, the Eleventh Circuit found that there was "no support" for finding that alternative service under Rule 4(f)(3) would "minimiz[e] offense to Austrian law . . . in the face of Austria's direct prohibition of service on OPEC without its consent." *Prewitt*, 353 F.3d at 927-28; *see also* Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f). The Eleventh Circuit recognized that "Austrian law clearly provides protection to OPEC as an international organization from *all methods of service of process* without its consent and also requires that *any service of process from abroad* be effected through Austrian authorities." *Prewitt*, 353 F.3d at 927-28 (emphasis added). In that case, "[r]ather than minimizing offense to Austrian law, the failure to obtain OPEC's consent [to service] would constitute a substantial affront to Austrian law." *Id.* Accordingly, the Eleventh Circuit concluded that the gravity of violating the applicable Austrian law was such that "under the facts and circumstances of this case, directing service of process would constitute a clear abuse of discretion." *Id.* at 928 n.21.

As discussed above, these findings from *Prewitt* apply to service on OPEC through U.S. counsel just as they do to service by email or fax.

In *Prewitt*, the Eleventh Circuit distinguished a Ninth Circuit case, *Rio Properties, Inc. v. Rio International Interlink*, which is the only Court of Appeals case that has approved—albeit without significant analysis—service upon a defendant's U.S. counsel.  *Prewitt*, 353 F.3d at 927-28 (distinguishing *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1014 (9th Cir. 2002)).  The *Prewitt* court found that "[t]he most important distinction . . . is that in *Rio*, there was no discussion of Costa Rican law at all, much less of any prohibitions relating to service of process and thus, no need to take into account the advisory note to Fed. R. Civ. P. 4(f)(3) directing that alternative service of process should minimize offense to foreign law."  *Prewitt*, 353 F.3d at 928.

The five district court cases referenced by Plaintiff—and noted by the D.C. Circuit in its Opinion, *see Freedom Watch*, 766 F.3d at 83 (D.C. Cir. 2014)—can all be distinguished upon the exact same grounds as *Prewitt* distinguished the *Rio* case: there was no prohibition relating to service of process in the foreign law.  In *Brookshire Brothers, Ltd. v. Chiquita Brands International, Inc.*, the court did not discuss Ecuadorian law, much less any prohibition in Ecuadorian law of service of process through foreign counsel.  No. 05-CIV-21962, 2007 WL 1577771, at *2 (S.D. Fla. May 31, 2007).  Similarly, in *U.S. Commodity Futures Trading Commission v. Aliaga*, the court did not provide any analysis or discussion of the service of process laws of the Dominican Republic.  272 F.R.D. 617, 619-21 (S.D. Fla. 2011).  In *RSM Production Corp. v. Fridman*, the court also did not provide any analysis or discussion of Russian law on allowing service on U.S. counsel.  No. 06 CIV. 11512 (DLC), 2007 WL 2295907, at *1-6 (S.D.N.Y. Aug. 10, 2007).  In *LG Electronics, Inc. v. ASKO Appliances, Inc.*, the court found that process had already been served pursuant to Rule 4(f)(1), but alternatively

found that service could occur through U.S. counsel without any discussion of Korean law, much less any prohibition in Korean law of service of process through foreign counsel.  No. 08-828 (JAP), 2009 WL 1811098, at *4 (D. Del. June 23, 2009).

The only case cited by Plaintiff which discusses foreign law at all in deciding whether to allow alternative service under Rule 4(f)(3) is *In re Potash Antitrust Litigation*, 667 F. Supp. 2d 907, 931 (N.D. Ill. 2009), *vacated on other grounds*, *Minn-Chem, Inc. v. Agrium Inc.*, 657 F.3d 650 (7th Cir. 2011).  In that case, however, the court found—in direct contrast to the Austrian laws at issue in the present case—that Russian law "allows flexibility and empowers the Court to customize the manner of service utilized to the facts and circumstances of a particular case." *Id.* at 931.  It was only after the court had satisfied itself that there was no violation of foreign law that it allowed alternative service under Rule 4(f)(3).  *Id.*

In summary, the authorities cited above demonstrate that federal courts avoid authorizing methods of service that would violate express prohibitions of foreign law or that would cause serious affront to foreign law, as such offenses cannot be "minimize[d]" as required by the 1993 Advisory Committee Notes and by the D.C. Circuit.  Fed. R. Civ. P. 4, Advisory Comm. Notes, 1993 Amends., Subdiv. (f); *Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014).  Moreover, in remanding this case solely for this Court to exercise its discretion under Rule 4(f)(3), the D.C. Circuit emphasized that this Court should only allow service on OPEC through U.S. counsel "if it would 'minimize' offense to Austrian law." *Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014).  The D.C. Circuit explicitly noted that it was not in any way ordering this Court to grant any alternative method of service to Plaintiff:

> Our decision to remand should not be mistaken for agreement with
> Freedom Watch that the district court *must* authorize some method
> of serving process on OPEC as a matter of due process, public
> policy, or enforcement of United States antitrust law.  Freedom

> Watch identifies no authority obligating a district court to authorize an alternative method of service under Rule 4(f)(3) when there is no other available method to serve the defendant without its consent.  Indeed, this court has made clear that, insofar as the formal requirements of service of process give rise to a "loophole" enabling a defendant to evade service of process, *the legislature* can, of course, remove it by amending the statute to provide an alternative method of service.

*Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014) (internal citations, quotation marks, and alterations omitted, emphasis in the original).

As detailed above, Austrian law would be violated by service on OPEC through U.S. counsel.  In fact, it would violate Austria's prohibitions on (1) service on OPEC without its consent; (2) service on international organizations without involving the Austrian Federal Ministry for European and International Affairs; (3) service on Austrian residents without the involvement of the Austrian courts; and (4) non-governmental authorities acting as process servers for service in Austria.  *See supra* Part III.B; *see also Freedom Watch*, 288 F.R.D. at 232 (D.D.C. 2013) (listing the prohibitions on service under Austrian law).  Indeed, as Mr. Hahnkamper confirms, "attempting transmittal of service to OPEC through US counsel *would cause precisely the same violations*" of Austrian law as the methods of service previously rejected by this Court.  Hahnkamper Second Supp. Decl. ¶ 9 (emphasis added).  The offense to Austrian law would not be minimized by service on U.S. counsel, as the Austrian Government itself confirms in its *Note Verbale*, stating that service through U.S. counsel would be "contrary to both Austrian and international law" and "regarded as invalid."  2014 *Note Verbale* (El-Badri Second Supp. Decl., Ex. 1).

Because the substantial affront to Austrian law cannot be minimized by service through U.S. counsel, this Court should deny Plaintiff's Motion and reject Plaintiff's request to serve OPEC through its U.S. counsel.  As the Eleventh Circuit concluded based on identical violations

of Austrian law in *Prewitt*, "under the facts and circumstances of this case, directing service of

process [on OPEC] *would constitute a clear abuse of discretion*."  *Prewitt*, 353 F.3d at 928 n.21

(emphasis added).  This Court found in its 2013 Memorandum Opinion that there is no "reason

to stray from *Prewitt*'s reasoning here" and rejected service of process on OPEC under Rule

4(f)(3).  *Freedom Watch*, 288 F.R.D. at 233 (D.D.C. 2013).  Given that the Plaintiff's proposed

service on OPEC through U.S. counsel would lead to identical violations of Austrian law as

Plaintiff's other proposed—and rejected—methods of service on OPEC, this Court should

similarly reject service on OPEC through U.S. counsel.

## IV.   THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO AUTHORIZE SERVICE ON OPEC THROUGH ITS U.S. COUNSEL UNDER RULE 4(F)(3) WHERE SUCH SERVICE WOULD BE CONTRARY TO CUSTOMARY INTERNATIONAL LAW

This Court also should not authorize service on OPEC through its U.S. counsel under

Rule 4(f)(3) because such authorization would violate customary international law.  Absent a

conflicting directive from either Congress or the President, this Court is obligated to avoid

violations of customary international law.  *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 733-34,

124 S. Ct. 2739, 2766 (2004) (noting that where there is "'no controlling executive or legislative

act,'" the United States courts must abide by "the current state of international law") (quoting

*The Paquete Habana*, 175 U.S. 677, 700, 20 S. Ct. 290 (1900)); *Comm. of U.S. Citizens Living in

Nicaragua v. Reagan*, 859 F.2d 929, 939 (D.C. Cir. 1988) ("[W]here there is . . . no controlling

executive or legislative act or judicial decision, resort must be had to the customs and usages of

nations.") (quoting *Paquete Habana*, 175 U.S. at 700).

In the present case, the political branches have given no indication that OPEC should be

served through its U.S. counsel.  In fact, the Executive Branch has openly and unambiguously

opposed having the federal courts get involved in such actions.  *Amicus Curiae* Brief of the

United States at 1-3, *Spectrum Stores, Inc.*, *v. CITGO Petroleum Corp.*, 632 F.3d 938 (5th Cir. 2011) (No. 09-20084) (ECF No. 9-4) ("Although in the 50 years since the founding of [OPEC] the various Presidential Administrations have taken diverse approaches to our Nation's foreign policy toward foreign oil-producing states, *one constant reality across Administrations has been the Executive Branch's conclusion that this matter should not be managed through private litigation*." (emphasis added)).   Moreover, as discussed below, *see infra* Part VI, the Executive Branch has favored a policy toward OPEC that respects its status as an international organization.   Accordingly, this Court must seek to abide by customary international law in determining whether to permit service on OPEC under Rule 4(f)(3).

As explained by OPEC's expert on international law, Stephen Schwebel, former President of the International Court of Justice, service on OPEC through its U.S. counsel without the consent of its Secretary General is prohibited by customary international law on two grounds. First, such service "would violate the jurisdictional immunity of OPEC as an international organization comprised solely of sovereign member States" and, second, "use of OPEC's U.S. counsel as a mechanism to transmit the service to OPEC's headquarters in Austrian territory would constitute a substantial affront to Austria's territorial sovereignty."   Schwebel Supp. Op. ¶ 8 (internal quotations omitted).

With respect to OPEC's general jurisdictional immunity, Judge Schwebel explains that for any method of service of process on an international organization to comply with customary international law, the method of service must be "conditioned specifically" on a waiver of immunity to "*that method of service*."   Schwebel Supp. Op. ¶ 10.   Indeed, even U.S. courts have recognized that "international organizations are immune from every form of legal process except insofar as [their] immunity is expressly waived by treaty or expressly limited by statute."

*Broadbent v. Org. of Am. States*, 481 F. Supp. 907, 908 (D.D.C. 1978), *aff'd*, 628 F. 2d 27 (D.C. Cir. 1980); *see also Mendaro v. World Bank*, 717 F.2d 610, 615 (D.C. Cir. 1983) ("Courts of several nationalities have traditionally recognized th[e] immunity [of international organizations], and it is now an accepted doctrine of customary international law."). Moreover, OPEC's immunity in U.S. courts under customary international law is unaffected by the fact that the United States is not a party to OPEC. *See* Schwebel Supp. Op. ¶¶ 13-16.

In the present case, OPEC plainly has not waived its immunity either generally or conditionally, a fact which Freedom Watch does not dispute. There is no indication whatsoever that OPEC has consented to the jurisdiction of the United States District Court based on any particular method of transmitting service. On the contrary, as the OPEC Secretary General declared expressly, OPEC "never consented . . . to service of process on OPEC of any complaint filed against it" and never authorized counsel to accept service on OPEC's behalf. *See* El-Badri Decl. ¶ 15 (ECF No. 6). Moreover, by appearing merely in a limited capacity to contest the Court's jurisdiction, OPEC "clearly indicate[d]" that it was "not willing to submit to the district court's jurisdiction." *Gerber v. Riordan*, 649 F.3d 514, 520 (6th Cir. 2011); *see also Broadbent*, 481 F. Supp. at 908 ("[I]nternational organizations are immune from every form of legal process except insofar as that immunity is expressly waived . . . ."). Accordingly, OPEC's immunity under customary international law requires the Court to decline authorization of service on OPEC through U.S. counsel.

Judge Schwebel also identifies a second violation of customary international law that would be caused by Freedom Watch's proposed method of service on OPEC through its U.S. counsel. Using U.S. counsel as a "mechanism to transmit the service" to OPEC abroad, *Freedom Watch*, 766 F.3d at 84 (D.C. Cir. 2014), would constitute a "substantial affront to

Austria's exclusive territorial sovereignty."  Schwebel Supp. Op. ¶ 18.

As Judge Schwebel explains, exclusive territorial sovereignty is a "foundational principle" of customary international law, as confirmed by numerous sources of international law, including the Restatement, international courts and Article 2 of the United Nations Charter. Schwebel Supp. Op. ¶ 19; *see also* Restatement § 206 & cmt. b ("Under international law, a state has . . . sovereignty over its territory," which entails "a state's lawful control over its territory generally to the exclusion of other states, authority to govern in that territory, and authority to apply law there.").  United States courts have also long-recognized this fundamental principle of exclusive territorial sovereignty.  *See Schooner Exch. v. McFaddon*, 11 U.S. 116, 137 (1812) (Marshall, C.J.) ("This full and absolute territorial jurisdiction being alike the attribute of every sovereign, and being incapable of conferring extra-territorial power, would not seem to contemplate foreign sovereigns nor their sovereign rights as its objects. . . . One sovereign can be supposed to enter a foreign territory only under an express license . . . ."); *The Antelope*, 23 U.S. 66, 122 (1825) (Marshall, C.J.) ("No principle of general law is more universally acknowledged, than the perfect equality of nations.").

Consistent with this fundamental principle, "[u]nder international law, a state may determine the conditions for service of process in its territory in aid of litigation in another state . . . ."  Restatement § 471.  Moreover, under the law of many States, service of process constitutes "a sovereign act that may be performed in their territory only by the state's own officials and in accordance with its own law."  *Id.* § 471, cmt b.  As Judge Schwebel explains, it is precisely because service of process is a sovereign act "that both the 1965 Hague Service Convention and the 1954 Hague Civil Procedure Convention preserve the States parties' right to refuse a request for service of process if the State deems that compliance would infringe its

sovereignty."   Schwebel Supp. Op. ¶ 21 (internal quotations and alterations omitted); *see also* Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters art. 13, Nov. 15, 1965, 658 U.N.T.S. 165 (I-9432) (Schwebel Supp. Op., Ex. 6) ("Where a request for service complies with the terms of the present Convention, the State addressed may refuse to comply therewith only if it deems that compliance would infringe its sovereignty or security."); Hague Convention Relating to Civil Procedure art. 4, Mar. 1, 1954, 286 U.N.T.S. 267 (I-4173) (Schwebel Supp. Op., Ex. 7) ("Service in accordance with Articles 1, 2 and 3 may be refused only if the State in whose territory it is to be effected deems it likely to prejudice its sovereignty or security.").

As indicated by OPEC's Austrian law expert, Wolfgang Hahnkamper, as well as Austria's own *Notes Verbales* and brief as *amicus curiae* in this case, service on OPEC through OPEC's U.S. counsel would constitute a substantial affront to Austria's exclusive territorial sovereignty.  *See* Hahnkamper Decl. ¶¶ 13, 16-18 (ECF No. 7); Hahnkamper Second Supp. Decl. ¶¶ 9-16; 2014 *Note Verbale* (El-Badri Second Supp. Decl., Ex. 1); *Note Verbale* of the Austrian Federal Ministry for European and International Affairs dated June 21, 2012 ("2012 *Note Verbale*") (ECF No. 6 at 85-86); 2003 *Note Verbale* (ECF No. 7 at 219-21); *Amicus Curiae* Brief of the Republic of Austria, *Freedom Watch, Inc. v. Org. of the Petroleum Exporting Countries*, 766 F.3d 74 (D.C. Cir. 2014) (No. 13-7019) (Schwebel Supp. Op., Ex. 5).  And as discussed more fully above, service on OPEC through its U.S. counsel would also result in significant violations of Austrian law.  *See supra* Part III.B.

The court should therefore reject Freedom Watch's request for service on OPEC through its U.S. counsel under Rule 4(f)(3), as it would result in significant violations of customary

international law, including service on an international organization that is internationally

immune from service of process and to significant violations to Austria's territorial sovereignty.

**V.     THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO AUTHORIZE
        SERVICE ON OPEC THROUGH ITS U.S. COUNSEL UNDER RULE
        4(F)(3)WHERE DOING SO WOULD BE FUNDAMENTALLY UNFAIR AND
        PREJUDICIAL TO OPEC'S DUE PROCESS RIGHTS TO RETAIN COUNSEL
        AND CONTEST THIS COURT'S JURISDICTION**

In deciding to exercise its discretion to authorize service on OPEC's U.S. counsel under

Rule 4(f)(3), this Court should also consider OPEC's due process rights. *See* Fed. R. Civ. P. 4,

Advisory Comm. Notes, 1993 Amends., Subdiv. (f) (noting that courts should make "an earnest

effort . . . to devise a method of communication that is consistent with due process").

Defendants have a due process right to retain counsel to object to this court's jurisdiction,

including personal jurisdiction stemming from valid service of process. *See Ins. Corp. of

Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S. Ct. 2099, 2104

(1982) ("The requirement that a court have personal jurisdiction flows . . . from the Due Process

Clause."). Indeed, "the method of service crafted by the court must . . . afford [defendants] an

opportunity to present their objections." *Nuance Commc'ns, Inc. v. Abbyy Software House*, 626

F.3d 1222, 1240 (Fed. Cir. 2010) (citation and quotation marks omitted). Here, OPEC has only

appeared for the "limited purpose of demonstrating lack of service of process and, as provided in

the Court's August 7, 2012 Minute Order, to give notice of the additional defenses it intends to

raise in this action." Memorandum of Points and Authorities in Support of OPEC's Motion to

Dismiss for Lack of Service of Process (ECF No. 5), at 1. That is to say, OPEC only appeared in

order to exercise its due process right to contest the Court's jurisdiction, and has not authorized

U.S. counsel to accept service. *Freedom Watch,* 288 F.R.D. at 233 (D.D.C. 2013); *see also

Gerber v. Riordan*, 649 F.3d 514, 520 (6th Cir. 2011) ("[B]y appearing solely to contest

jurisdiction, a defendant clearly indicates that he is not willing to submit to the district court's

jurisdiction."). Under these circumstances, any ruling that OPEC can be served through its U.S. counsel would be fundamentally unfair and violate OPEC's due process rights.

In *Prewitt*, OPEC did not originally respond to the complaint or retain counsel to contest the plaintiff's service of process. *Prewitt*, 353 F.3d at 918. In that case, "the district court entered a default judgment against OPEC," *id.*, and an injunction that barred OPEC and its member States from "entering into any agreements amongst themselves or with third parties to raise, lower, or otherwise determine the volumes of production and export of crude oil." *Prewitt Enters., Inc. v. Org. of the Petroleum Exporting Countries*, No. CV-00-W-0865-S, 2001 WL 624789, at *10 (N.D. Al. Mar. 22, 2001). Had this default judgment and injunction from a federal court been allowed to take effect, it could have seriously impacted upon the entire global oil market and U.S. foreign policy.

Once OPEC retained counsel in *Prewitt* and moved to vacate the default judgment on the grounds that OPEC had not been properly served, the district court found that the "complaint must be dismissed for lack of jurisdiction" as "the applicable Austrian law prohibits service without OPEC's consent." *Prewitt*, 353 F.3d at 919. On appeal, the Eleventh Circuit affirmed, noting that "there are no means available for service upon OPEC under the Federal Rules of Civil Procedure, *id.*, and that any order of service on OPEC "would constitute a clear abuse of discretion," *id.* at 928 n. 21. But were this Court to allow OPEC to be served through its U.S. counsel, OPEC would be faced with a fundamentally unfair dilemma. It could (1) refuse to retain counsel, relying on its rights under customary international law and its international agreement that no service is allowed without its consent, but risk default judgments from American courts and potential disruption associated therewith; or (2) retain counsel to contest service of process and avoid default judgments, but in so doing render itself—contrary to its

express intentions and Austrian and international law—amenable to service through its own counsel.

As Defendant's legal practice expert, Mr. Gregory Joseph—the former President of the American College of Trial Lawyers and Chair of the 60,000-member American Bar Association Section of Litigation—confirms, there are numerous due process implications to authorizing alternative service on the U.S. counsel of a foreign defendant where such service is prohibited by foreign law.  Declaration of Gregory Joseph ("Joseph Decl.") ¶ 6.  As he notes, "[s]uch a ruling would effectively deprive the foreign client of any ability to retain U.S. counsel to appear in a U.S. court to assert legitimate defenses to the manner in which process was served on the client. The client would be forced to abandon any meaningful defense to service because, by retaining U.S. counsel, it would immediately become amenable to service."  *Id.* ¶ 6.a.

A ruling permitting service on counsel who is not authorized to accept service "would also drastically restrict the client's free choice of counsel."  Joseph Decl. ¶ 6.b.  "A fundamental premise of the adversary system is that individuals have the right to retain the attorney of their choice to represent their interests in judicial proceedings."  *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441, 105 S. Ct. 2757, 2766 (1985) (Brennan, J., concurring).  Indeed, this Court has recognized the importance of "'a client's right to freely choose his counsel.'"  *Headfirst Baseball LLC v. Elwood*, 999 F. Supp. 2d 199, 204 (D.D.C. 2013) (Walton, J.) (quoting *Derrickson v. Derrickson*, 541 A.2d 149, 152 n.6 (D.C. 1988)).  As Mr. Joseph describes, by authorizing service of the manner requested here, a foreign client would be effectively unable to "retain any U.S. lawyer located in the United States, much less in the district in which the litigation against it is pending, to defend the client on service of process grounds."  Joseph Decl. ¶ 6.b.

Such a ruling permitting service through counsel would also "interfere with the client's 'ultimate authority to determine the purposes to be served by legal representation' because it would deprive the client of the right to refuse to authorize its counsel to accept service of process on its behalf—a decision consciously made by OPEC in this case." Joseph Decl. ¶ 6.b. (quoting D.C. R. of Prof'l Conduct 1.2, cmt. 1 (2007)); *see also* El-Badri Decl. ¶ 15 (ECF No. 6). Thus, any foreign defendant seeking to contest the court's jurisdiction—in particular on service of process grounds—would be unable retain U.S. counsel without unintentionally authorizing them to accept service.

OPEC's U.S. counsel has specialized skill, knowledge, and experience relating to OPEC's potential defenses that is of significant value to its client. As the District Court has noted, "[a] litigant has a right to freely chosen, competent counsel. The protection of that right is particularly important in this case, where the attorneys sought to be disqualified have a unique and probably irreplaceable value to their client." *Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 27 (D.D.C. 1984). Here, if Freedom Watch is allowed to serve OPEC through its U.S. counsel, OPEC's U.S. counsel "could be forced to resign its representation of OPEC rather than serve as OPEC's unappointed and involuntary agent for receipt of service of process." Joseph Decl. ¶ 6.b. This would only further limit OPEC's ability to assert its defenses in this case and prejudice OPEC's due process rights.

For all of these reasons, it would be fundamentally unfair and violate OPEC's due process rights to allow OPEC to be served through the very counsel that it retained solely to contest service of process in this case. The Court should not exercise its discretion to deprive OPEC of its counsel resulting in fundamental unfairness.

**VI.    THE COURT SHOULD NOT EXERCISE ITS DISCRETION TO AUTHORIZE
SERVICE ON OPEC THROUGH ITS U.S. COUNSEL UNDER RULE 4(F)(3)
WHERE DOING SO WOULD IMPAIR THE FOREIGN POLICY INTERESTS
OF THE UNITED STATES**

Finally, given OPEC's special status as a significant foreign-based international
organization comprised of sovereign member states, this Court should also consider the
implications to U.S. foreign policy interests from authorizing a method of service in
contravention of OPEC's consent, foreign law, and customary international law.  *See Sosa*, 542
U.S. at 733-34 & n.21, 124 S. Ct. 2739, 2766 & n.21 (explaining that where "[t]he Government
of [a foreign State] has said that these cases interfere with the policy embodied by its
[legislation]" and "[t]he United States has agreed," "federal courts should give serious weight to
the Executive Branch's view of the case's impact on foreign policy.").

The importance of OPEC and its oil-producing member states to United States foreign
policy cannot be overstated, and has been repeatedly affirmed by American government officials.
*See* Chronology of the International Oil Policy of the United States of America (1950-2008)
(OPEC's Mot. to Dismiss, Ex. 4) (ECF No. 9-3).   It is for this reason that the United States
Government has unambiguously stated that "it is for the Executive Branch, not the courts, to
determine how best to protect United States foreign policy and national security interests in
regard to foreign oil-producing states." *Amicus Curiae* Brief of the United States at 2, *Spectrum
Stores, Inc.*, *v. CITGO Petroleum Corp.*, 632 F.3d 938 (5th Cir. 2011) (No. 09-20084) (ECF No.
9-4).  Indeed, the United States Government has openly opposed civil litigation against OPEC in
U.S. courts, such as the present action, because such actions improperly "ask th[e] Court to judge
the legality of acts of state by foreign governments" and they compromise U.S. economic
interests.  *Id.* at 1-3.  As the United States has cautioned, "[j]udicial action on such a sensitive
matter [as a lawsuit against the state oil companies of OPEC's member states] could result in oil

embargoes, the divestiture of foreign state assets in the United States, retaliatory conduct against U.S. oil producers, and reduction in cooperation on unrelated but critically important issues." *Id.* at 3.

The United States also has a foreign policy interest in sustaining the immunities for international organizations.  The United States is host to numerous international organizations, including the United Nations, the World Bank, the International Monetary Fund, the Inter-American Development Bank, and the Organization of American States, and, significantly, is also a member—often with leadership roles—of these organizations.  As Judge Schwebel explains, a decision authorizing service through U.S. counsel would undermine the immunities of international organizations set forth in customary international law and the international organizations' respective headquarters agreements.  Schwebel Supp. Op. ¶ 35.  He cautions:

> [I]f the United States District Court gives its influential stamp of approval to the method of service proposed by Freedom Watch, these international organizations could be subjected to a wave of lawsuits throughout the world.  In such an eventuality, neither customary international law nor these organizations' headquarters agreements nor the immunities to which these organizations are legally entitled could provide these international organizations with protection.  Should these international organizations seek to contest the validity of service in any jurisdiction of the world—such as, for example, in the courts of Austria—the plaintiff could simply serve process on the local counsel appearing for the international organization in those proceedings.

*Id.*  Were this Court to allow service on OPEC, it would be encouraging courts, not just in the United States but around the world, to ignore the traditional immunities of international organizations and allow service and suits to proceed against all international organizations, many of which are critical to United States foreign policy.

As Judge Schwebel further notes, the United States also has an interest in maintaining the "venerable framework for international judicial cooperation comprised of the 1965 Hague

Service Convention, the 1954 Hague Civil Procedure Convention, the 1975 Inter-American Convention on Letters Rogatory, and the well-established practice of exchanging *ad hoc* letters rogatory with foreign courts." Schwebel Supp. Op. ¶ 36. The United States has long endorsed this framework, as presently reflected in Rule 4(f)(1) and Rule 4(f)(2)(B) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 4; *see also Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 247, 124 S. Ct. 2466, 2473 (2004) ("Congress first provided for federal-court aid to foreign tribunals in 1855; requests for aid took the form of letters rogatory forwarded through diplomatic channels."). A decision in the present case that unilaterally allows a method of process that does not conform to the requirements of the multilateral conventions, is not authorized by a foreign court's response to a letter rogatory, and is expressly prohibited by the receiving State's law, would, as Judge Schwebel remarks, "threaten[] to render this essential framework a nullity." Schwebel Supp. Op. ¶ 37. Judge Schwebel cautions that "[f]oreign courts will inevitably become less willing to respect the process of [a] United States court or, ultimately, to enforce its judgments." *Id.*

Consistent with U.S. foreign policy, judicial, and economic interests, this Court should reject Freedom Watch's request for alternative service on OPEC's U.S. counsel. Such a ruling would be "more dangerous now than ever before in world history," Schwebel Supp. Op. ¶ 38, when "the sheer volume of transnational disputes generated by a globalizing economy has brought national judges into contact with one another as never before . . . ." *See* Anne-Marie Slaughter, *A Global Community of Courts*, 44 Harv. Int'l L.J. 191, 193 (2003).

## CONCLUSION

For all the foregoing reasons, the Court should decline to exercise its discretion under Rule 4(f)(3) to permit service on OPEC in violation of an international agreement, Austrian law, customary international law, and due process and it should therefore deny Freedom Watch's Motion for Leave to Serve Defendant's U.S. Counsel and reaffirm its dismissal of Plaintiff's Complaint dated May 7, 2012.

Respectfully submitted on December 11, 2014:


/s/ Carolyn B. Lamm
Carolyn B. Lamm (D.C. Bar No. 221325)
Hansel T. Pham (D.C. Bar No. 489203)
Anne D. Smith (D.C. Bar No. 930867)
**WHITE & CASE** LLP
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 626 3600
Email: clamm@whitecase.com
Email: hpham@whitecase.com
Email: asmith@whitecase.com

Seth P. Waxman (D.C. Bar No. 257337)
Paul R.Q. Wolfson (D.C. Bar No. 414759)
**Wilmer Cutler Pickering**
**Hale and Dorr LLP**
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 663-6000
Email: seth.waxman@wilmerhale.com
Email: paul.wolfson@wilmerhale.com

Robert A. Milne
Raj S. Gandesha
Bryan D. Gant
**WHITE & CASE** LLP
1155 Avenue of the Americas
New York, New York 10036
Telephone: (212) 819-8200
Email: rmilne@whitecase.com
Email: rgandesha@whitecase.com
Email: bgant@whitecase.com

*Attorneys for the Organization of the*
*Petroleum Exporting Countries*